833 A.2d 89 (2003)
363 N.J. Super. 382
In the Matter of Allen M. FARNKOPF, Alleged to be in need of Protective Services.
Superior Court of New Jersey, Appellate Division.
Submitted September 9, 2003.
Decided October 22, 2003.
*91 Andrea Rhea, Pennsville, attorney for appellant Salem County Office on Aging.
Respondents have not filed briefs.
Before Judges SKILLMAN, WELLS and FISHER.
*90 The opinion of the court was delivered by FISHER, J.A.D.
The Adult Protective Services Act (the Act)[1] authorizes protective services providers, such as appellant Salem County Office on Aging, to pursue legal relief for the benefit of vulnerable adults. In this case, a local bank advised the Office on Aging that a 90-year old widower, Allen M. Farnkopf, was withdrawing $70,000 in cash to give to his caretaker. The Office on Aging immediately investigated and successfully applied for access to Mr. Farnkopf and his home, and permission to have Mr. Farnkopf psychiatrically evaluated. The Chancery judge also appointed what he referred to as an "interim conservator/guardian" for Mr. Farnkopf's assets. After the entry of a second order for additional relief, which was then continued for approximately 60 days, the action was dismissed. A few months later, the "interim conservator/guardian" moved for the payment of his fees; the court ultimately imposed the obligation to pay those fees upon the Office of Aging. Because the record does not support a finding that the Office on Aging acted frivolously, but rather appropriately pursued, consistent with its statutory authority, the vindication of Mr. Farnkopf's best interests, we reverse.

I
The Act constitutes a legislative response to the risks and dangers of abuse, neglect and exploitation faced by our older, infirm and vulnerable citizens, as well as all other adults who are physically or mentally disabled or deficient. To meet these concerns, the Act created an efficient system for reporting the neglect, abuse and exploitation of vulnerable adults, and established the authority by which the Superior Court may intervene, on an expedited basis, to protect "vulnerable adults".
The Act defines a "vulnerable adult" as a person "18 years of age or older who resides in a community setting and who, because of a physical or mental illness, disability or deficiency, lacks sufficient understanding or capacity to make, communicate, or carry out decisions concerning his well-being and is the subject of abuse, neglect or exploitation." N.J.S.A. 52:27D-407. Upon receiving a report that a vulnerable adult is being or has been the subject of abuse, neglect or exploitation, a county adult protective services provider (provider) "shall initiate a prompt and *92 thorough evaluation of the report within 72 hours." N.J.S.A. 52:27D-410a and b. If prevented or hampered, a provider may petition for an order compelling the evaluation. N.J.S.A. 52:27D-410c. If there is "reasonable cause" to believe a "vulnerable adult has been the subject of abuse, neglect or exploitation," the provider is required to "determine the need for protective services" and make formal referrals to state, county and local agencies, and hospitals and organization, for services. N.J.S.A. 52:27D-411a. The provider is also required to "follow up on referrals," N.J.S.A. 52:27D-411a, and may seek injunctive relief against a caretaker or any other person who interferes with the providing of protective services, N.J.S.A. 52:27D-412a.
In exigent circumstances and when the vulnerable adult refuses or is unable to consent, the provider "shall petition a court of competent jurisdiction for an order authorizing the provision of protective services." N.J.S.A. 52:27D-413a. The Act requires that the court set the matter down for a hearing within 24 hours of receipt of the petition, and allows for the appointment of counsel. N.J.S.A. 52:27D-413b.

II
On May 7, 2001, the Office on Aging obtained a referral that Mr. Farnkopf was about to withdraw $70,000 in cash to give to his caretaker. On May 8, 2001, in accordance with its statutory obligations, the Office on Aging obtained an order from the Chancery judge permitting access to the person and property of Mr. Farnkopf, appointing Jonathan J. Garbini, Esq. as "interim conservator/guardian" (Garbini) to take custody of Mr. Farnkopf's assets, and authorizing the Office on Aging to arrange for a psychiatric evaluation. The order memorialized the Chancery judge's finding that Mr. Farnkopf "is a vulnerable adult in need of protective services as a result of exploitation by [an]other," and scheduled another hearing for May 11, 2001.
The Office on Aging engaged the services of Dr. David M. Friel, a board certified psychiatrist, who provided his impressions upon visiting Mr. Farnkopf on May 10. Dr. Friel found that Mr. Farnkopf was widowed and living alone in a single family dwelling. When he arrived, Dr. Friel observed Mr. Farnkopf and two friends searching outside the premises for a house key. He was advised that Mr. Farnkopf had a propensity to hide keys in various places but unfortunately often forgot where. When the key was eventually located, and the front door opened, three cats ran out. Dr. Friel observed that "part of the house was very dirty and full of trash, [and][t]he odor was so foul [he] was only able to tolerate several minutes in the dwelling." Dr. Friel found that Mr. Farnkopf was alert, oriented to person, place and time, and friendly and cooperative.
As for the bank transaction which compelled this investigation, Dr. Friel reported that
Mr. Farnkopf wants to give a large sum of money to a woman he says he has known for three years who he met at Cowtown. When I asked him why he would do this he replied that she "is a nurse and promised to care for him and bury him." He did not comprehend the gravity of giving large sums of money away as a gift. His ability to think abstractly is markedly impaired as is his insight and judgement....
Mr. Farnkopf is not competent to make financial decisions on his own behalf.
Based on this additional information, on May 11, 2001 the Chancery judge entered *93 an order which again stated that Mr. Farnkopf "is a vulnerable adult in need of protective services as a result of exploitation by [an]other," continued the appointment of Garbini as "conservator to preserve Mr. Farnkopf's assets," permitted the caretaker to have contact with Mr. Farnkopf, and authorized another examination of Mr. Farnkopf by a "physician acceptable to Mr. Farnkopf's conservator." Garbini's chosen physician examined Mr. Farnkopf on May 24, 2001 and reported on the same day that Mr. Farnkopf "is a delightful gentleman, ... oriented to time, place and person," who "shows no signs of dementia and is able to attend to his own personal and financial affairs."
On May 29, 2001, John M. Waters, Jr., Esq., advised the court of both his firm's retention by Mr. Farnkopf and the fact that he and his client "do not ... presently dispute the need for protective services." In addition, on June 7, 2001, counsel for the Office on Aging advised the Chancery judge that counsel for Mr. Farnkopf, counsel for the caretaker, and Garbini, had all agreed to the continuing of the May 11 order for protective services for another 30 days. The record does not reveal whether that order was ever entered, but the hearing scheduled for June 11 did not occur until July 11, 2001, suggesting that the terms of the proposed order were adhered to by the court and counsel.
On July 11, 2001, the Chancery judge dismissed the protective services matter. The order directed that control over Mr. Farnkopf's assets be relinquished and Garbini discharged, and also stated that payment of Garbini's fees "and the responsibility therefore, shall be determined upon submission of the appropriate application."
On or about July 24, 2001, the Office on Aging filed a complaint for the appointment of a conservator for Mr. Farnkopf.[2] At the same time, an order setting a hearing date was fixed for August 31, 2001 and Gary Salber, Esq. was appointed to represent Mr. Farnkopf.[3] In response, Mr. Farnkopf, through his privately-retained counsel, moved to dismiss the action, correctly and successfully claiming that his objection alone was sufficient to preclude the appointment of a conservator. N.J.S.A. 3B:13A-2; In re Conservatorship of Halley, 342 N.J.Super. 457, 462, 777 A.2d 68 (App.Div.2001). The Office on Aging did not oppose dismissal. As a result, on October 1, 2001, the conservatorship action was dismissed.
On November 21, 2001, Garbini moved in the protective services action for reimbursement of $2086.50 for services rendered in preserving Mr. Farnkopf's assets *94 and otherwise participating in that action. The Office on Aging opposed the entry of any order which would saddle it with the burden of paying these fees, claiming the lack of any legal authority "supporting the imposition of payment of ... fees upon the Salem County Office on Aging where the Office on Aging acted to fulfill its statutory obligation ... in connection with its Adult Protective Services Act responsibilities."
Without explanation, the Chancery judge entered an order on June 5, 2002 directing that Garbini's fees be paid by the Office on Aging within 30 days. It is the order's direction that the fees be paid by the Office on Aging that has been appealed and which we now consider and vacate.

III
We are initially hampered by the Chancery judge's failure to articulate his reasons for entering the June 5, 2001 order. R.1:7-4(a) requires that a court "find the facts and state its conclusions of law ... on every motion decided by a written order that is appealable as of right." As has often been said, the failure to comply with this obligation "constitutes a disservice to the litigants, the attorneys and the appellate court." Curtis v. Finneran, 83 N.J. 563, 569-70, 417 A.2d 15 (1980). "Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion. In the absence of reasons, we are left to conjecture as to what the judge may have had in mind." Salch v. Salch, 240 N.J.Super. 441, 443, 573 A.2d 520 (App.Div.1990).
Here, no oral or written decision was rendered by the Chancery judge. We have only his order, unfettered by an analysis of the facts or law upon which it may have been based. Ordinarily we would remand for an exposition of the judge's reasoning. However, because the record overwhelmingly demonstrates the absence of any factual or legal basis for shifting the payment of Garbini's fees upon the Office on Aging, we will reverse and remand for the entry of an order requiring that these fees be paid by Mr. Farnkopf.

IV
Because of the confusion surrounding these procedural events, we deem it helpful to briefly discuss the differences between actions commenced pursuant to the Adult Protective Services Act, and those in which the appointment of a guardian[4] or a conservator[5] is sought.
The Superior Court is empowered to appoint a guardian for the person or property, or both, of a person found to be incapacitated. N.J.S.A. 3B:12-25. A person is incapacitated, in this context, if "impaired by reason of mental illness or mental deficiency to the extent that he lacks sufficient capacity to govern himself and manage his affairs." N.J.S.A. 3B:1-2. The extent of incapacitation, of course, can vary in degree, requiring our courts to act cautiously so that a guardian is not empowered to do things which the ward may still be capable of. Matter of M.R., 135 N.J. 155, 166-67, 638 A.2d 1274 (1994). On the other hand, a conservator may be appointed for a "person who has not been judicially declared incompetent[6] but who *95 by reason of advanced age, illness or physical infirmity, is unable to care for or manage his property or has become unable to provide for himself or others dependent upon him for support." N.J.S.A. 3B:13A-1a (emphasis added).
As can readily be seen, the terms "guardian" and "conservator" are mutually exclusive. Also, these offices differ in that the spectrum of a conservator's power is not nearly as wide as that bestowed upon a guardian. For example, the appointment of a conservator does not cause a transfer of title of the conservatee's property to the conservator. N.J.S.A. 3B:13A-16. However, when a guardian is appointed such a transfer does occur. N.J.S.A. 3B:12-38. The power of the conservator is also limited to financial matters. Conservators are not empowered to make medical or personal decisions for the conservatee, N.J.S.A. 3B:13A-23; guardians are, N.J.S.A. 3B:12-57. Conservatorships are also purely voluntary and consensual; the objection to the appointment of a conservator, as noted earlier, precludes the appointment. N.J.S.A. 3B:13A-2; Halley, supra, 342 N.J.Super. at 462, 777 A.2d 68. However, a finding that a person is incapacitated and in need of a guardian presupposes an inability to consent to the appointment.
While the Adult Protective Services Act permits intervention into these same areas, its purpose differs from guardianships and conservatorships in that the Act envisions only temporary intervention. That is, the Act expressly declares: "Permanent changes in the living situation of an abused, neglected or exploited vulnerable adult shall not be made under authority of this act." N.J.S.A. 52:27D-415 (emphasis added). Instead, the Act permits an adult protective services provider to immediately address a referral of abuse, neglect or exploitation, and to seek the court's intervention, if necessary, when presented with an emergent situation. Thus, in terms of duration, the Act's scope is far more limited than guardianship or conservatorship matters, which are generally viewed as permanent.[7]
Also, unlike conservatorships, the Act permits intervention not only when an individual has become unable to handle financial matters but also when there is a risk of physical or mental injury. That is, the Act permits intervention when the vulnerable adult is subjected to abuse, neglect, or exploitationterms which, as defined by the Act, suggest in varying degrees that the vulnerable adult is being subjected to physical or mental harm or injury[8] or at risk of financial loss. The Act also permits an adult protective services provider to "initiate appropriate legal action including, but not limited to, *96 petitioning for guardianship or conservatorship." N.J.S.A. 52:27D-416. In short, the Act provides the means for obtaining immediate relief for vulnerable adults and, if necessary, also empowers an adult protective services provider to seek more permanent relief by separate action.

V
With this understanding of the Act's purposes, we must also consider whether the appointment of a custodian of a vulnerable adult's assets is authorized before considering the imposition of a custodian's fees upon a provider. As already observed, the protective services action was immediately commenced by the Office on Aging upon its belief that Mr. Farnkopf was being exploited by his caretaker. This generated a perceived need to protect Mr. Farnkopf's assets from further risk and apparently caused the Chancery judge to conclude that an independent professional should be appointed to vindicate that concern.
While our courts have not previously examined the scope and application of the Act's provisions, we find authority for the appointment of a custodian of assets in the Act's essential mandate to provide "protective services" for vulnerable adults. "Protective services" include "voluntary or court-ordered social, legal, financial, medical or psychiatric services necessary to safeguard a vulnerable adult's rights and resources...." N.J.S.A. 52:27D-407. In our view, included within the broad parameters of these "protective services" is the authority to make an appointment of an attorney or other professional to "safeguard" assets pendente lite. And, in this case, the actual appointment of Garbini to perform that function was appropriate in order to gain the benefit of an independent repository for Mr. Farnkopf's assets until the Chancery judge could ascertain whether they should be returned to Mr. Farnkopf's control or further protected from exploitation.
We feel constrained to observe that the confusion which permeates these proceedings, and Garbini's role, and how his entitlement to fees should be examined, finds its most illustrative manifestation not in his appointment or the designated scope of his role but with the title assigned to him. By referring to Garbini as "interim conservator/guardian," the Chancery judge invited uncertainty as to Garbini's role and confounded our review of the imposition of his fees upon the Office on Aging.
Garbini was not appointed to be either a "guardian" or a "conservator" for Mr. Farnkopf, temporary or otherwise, and certainly not both simultaneously. Rather, Garbini was appointed to be the instrument by which the Chancery judge's determination to place Mr. Farnkopf's assets in custodia legis took life. The misnaming of such an appointment is not often materialcourts being accustomed to disregarding labels in favor of substance, Applestein v. United Bd. & Carton Corp., 60 N.J.Super. 333, 348, 159 A.2d 146 (Ch.Div.), aff'd o.b., 33 N.J. 72, 161 A.2d 474 (1960) particularly when a designation is accompanied, as it should be, by a full and clear description of that office. E.T., supra, 302 N.J.Super. at 541, 695 A.2d 734 ("the order of appointment should delineate, at least to the extent practical, the reasons for the appointment as a guide to the appointee of the nature of the services expected by the court to be performed.").
Even though the Chancery judge's description of Garbini's role was clear, the oxymoron used to summarize the scope of the appointment could have proven confusing to both Garbini and the other litigants. Accordingly, we commend the use of "custodian" or "custodian of assets" when describing *97 the title of such a professional in future actions.[9] While we recognize the rapidity with which such matters may come before our courts, their importance requires greater care and precision.

VI
Our review of the possible legal sources for the shifting of fees to the Office on Aging leads to the inexorable conclusion that there simply is no legal or factual basis for the order in question.

A
New Jersey follows the American Rule, which requires that parties bear their own counsel fees except in the few situations specifically permitted by statute or by our Supreme Court. In re Niles, 176 N.J. 282, 293, 823 A.2d 1 (2003). R.4:42-9 sets forth various instances in which fee shifting may be ordered. In examining the provisions which might have application in protective services actions, we are mindful of the history of R. 4:42-9 which, as the Supreme Court has repeatedly said, demonstrates New Jersey's adherence to the American Rule and a "strong policy against the shifting of counsel fees." Niles, supra, 176 N.J. at 293, 823 A.2d 1; see Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 440, 771 A.2d 1194 (2001); North Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 569, 730 A.2d 843 (1999). In canvassing the provisions of R.4:42-9(a) for potential bases for shifting the burden of Garbini's fees upon the Office on Aging, only a few possibilities are presented.
R.4:42-9(a)(2) permits an allowance of fees when a litigant commences or defends a suit concerning a "fund in court" to benefit the fund itself and not just the interests of that litigant. Henderson v. Camden County Mun. Auth., 176 N.J. 554, 564, 826 A.2d 615 (2003); Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162, 167-168, 162 A.2d 834 (1960). This provision, however, only authorizes fees to be paid from the fund in court. R.4:42-9(a)(3) permits an allowance in probate actions (even in favor of a losing party), but only specifically authorizes such fees to be paid "out of the estate." See In re Reisdorf, 80 N.J. 319, 327, 403 A.2d 873 (1979) ("the estate [is] the exclusive source of counsel fees"). These provisions do not support a shifting of the fees to the Office on Aging. Instead, they permit only an award of fees from Mr. Farnkopf's assets which, in such an analysis, would represent either the "fund in court" or "the estate". We thus find in R. 4:42-9(a)(2) or (3) no support for the order in question.
The literal terms of R.4:42-9 do not represent the only exceptions to the American Rule. The Supreme Court has also engaged in rule making through its judicial decisions, determining that in appropriate cases fees may be shifted to attorneys who are negligent, Saffer v. Willoughby, 143 N.J. 256, 272, 670 A.2d 527 (1996), to attorneys who intentionally violate their fiduciary duties, Packard-Bamberger, supra, 167 N.J. at 443, 771 A.2d 1194, upon an administrator's misappropriation of estate funds, In re Lash, 169 N.J. 20, 28-29, 776 A.2d *98 765 (2001), and where a fiduciary's undue influence "results in the development or modification of estate documents that create or expand the fiduciary's beneficial interest in the estate," Niles, supra, 176 N.J. at 299-300, 823 A.2d 1.
While Lash and Niles may be viewed as eroding R.4:42-9(a)(3)'s limitation to an award of fees "out of the estate," by permitting awards in favor of the estate against fiduciaries whose intentional acts cause an unnecessary loss to the estate, those decisions have no literal application to adult protective services actions. Moreover, there is no evidence in the record to suggest a breach or departure by the Office on Aging of its statutory obligations akin to what occurred in Lash or Niles. Even if a rational argument could be made for the expansion of Lash or Niles to the present situation, it must be recognized that the Court based those decisions upon its constitutional rule making authority, Lash, supra, 169 N.J. at 33-34, 776 A.2d 765; Niles, supra, 176 N.J. at 298, 823 A.2d 1, a power possessed by neither this court nor the trial court. Thus, we are not free to read or apply Lash or Niles expansively to encompass the present situation.

B
The responsibility for the payment of counsel fees may also be shifted when a party has filed a frivolous pleading. Both R. 1:4-8 and N.J.S.A. 2A:15-59.1 permit such awards in appropriate circumstances.
We summarily reject the application of R. 1:4-8 as justification for the Chancery judge's unexplained shifting of fees upon the Office on Aging. First, R. 1:4-8 permits sanctions only against attorneys (or pro se parties), not their clients. Trocki Plastic Surg. v. Bartkowski, 344 N.J.Super. 399, 405, 782 A.2d 447 (App.Div.2001), certif. denied, 171 N.J. 338, 793 A.2d 716 (2002). Since the responsibility for Garbini's fees was placed on the Office on Aging and not its counsel, the order is not justified by resort to R.1:4-8. Second, there is no evidence in the record to suggest that Garbini based his motion on this rule or complied with the procedural requirements of R.1:4-8(b). Assuming for the moment that the protective services action was commenced or continued through the filing of frivolous papers, the Office on Aging was never provided with a "window of opportunity" for withdrawing the pleading. This failure precludes R. 1:4-8 relief. Trocki, supra, 344 N.J.Super. at 406, 782 A.2d 447. Third, such a motion must be filed within 20 days following the entry of final judgment. R. 1:4-8(b)(2). Garbini's motion for fees was not filed until four months after the protective services action was dismissed and, thus, was time-barred.
While R. 1:4-8 creates only attorney liability for frivolous pleadings, N.J.S.A. 2A:15-59.1 extends only to parties. McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 549, 626 A.2d 425 (1993) ("We decline to extend the statute to the award of counsel fees and costs against attorneys."). Since the fees were imposed on the Office on Aging and not its counsel, any attempt to justify the order in question as being based upon a frivolous pleading must lie with N.J.S.A. 2A:15-59.1.
One of the similarities between the rule and the statute is the requirement that such applications be filed either before the entry of judgment or soon thereafter. As observed above, R.1:4-8 motions must be filed no later than 20 days from the entry of final judgment. We have likewise held that a motion based upon N.J.S.A. 2A:15-59.1 must be filed either before the entry of judgment or "possibly, at the latest, within ten days thereafter by a motion to alter or amend the judgment." Venner v. Allstate, 306 N.J.Super. 106, 113, 703 A.2d 330 (App.Div.1997); Czura v. *99 Siegel, 296 N.J.Super. 187, 190, 686 A.2d 390 (App.Div.1997). Garbini's motion was filed many months after dismissal and, thus, if based upon this statute, was untimely.
More importantly, however, we reject any contention that the Office on Aging's pleadings in the protective services action were frivolous. The Legislature has determined that the pleading of a nonprevailing person is frivolous if it "was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury," N.J.S.A. 2A:15-59.1b(1), or the nonprevailing person "knew, or should have known" that the pleading "was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law," N.J.S.A. 2A:15-59.1b(2). Our review of the record, as superimposed upon the provisions of the Act, compels only one conclusionthere was an adequate factual and legal basis for the Office on Aging to commence litigation and its pleadings were far from frivolous.
As the record reveals, the Office on Aging received a referral from a local bank that Mr. Farnkopf, a 90-year old widower whose only income consisted of $385 monthly social security payments, was about to withdraw $70,000approximately 50% of his liquid assetsto give to his caretaker. Upon receipt of this information, the Office on Aging was duty-bound to "initiate a prompt and thorough evaluation" within 72 hours. N.J.S.A. 52:27D-410b. The Office on Aging immediately applied for the entry of an order, obtained on May 8, 2001, granting unannounced access to Mr. Farnkopf and his property, enjoining the caretaker from interfering, appointing Garbini as "interim conservator/guardian" of his assets, and permitting a psychiatric evaluation. While our understanding of the proceedings below is frustrated by the Chancery judge's failure to explain his ruling, we are satisfied that the referral alone more than amply justified the application for the May 8 order.
The May 8 order, as its provisions reveal, was entered pursuant to and in accordance with N.J.S.A. 52:27D-410c and d (permitting an evaluation of the adult), -412a (permitting an injunction prohibiting caretaker interference), and 413e (permitting an order imposing needed protective services). The entry of such an order presupposes the Chancery judge's finding, by clear and convincing evidence, that Mr. Farnkopf was "a vulnerable adult in need of protective services" and would "incur a clear and substantial risk of death or immediate physical harm" in the absence of the granting of relief. N.J.S.A. 52:27D-413d. In fact, the pre-printed form order that was filled in and entered recites that the Chancery judge found Mr. Farnkopf to be "a vulnerable adult in need of protective services" as a result of "exploitation," and that there was a "clear and substantial risk of death or immediate physical harm without protective services." While we have not been provided with the judge's reasoning as to how these conclusory findings were reached, we are entirely satisfied from the record that the application was not pursued in bad faith or asserted for the purposes of harassment, delay or malicious injury.
The Chancery judge, as the order reflects, found the evidence supported a finding of "exploitation" by another. "Exploitation" is defined as "the act or process of illegally or improperly using a person or his resources for another person's profit or advantage." N.J.S.A. 52:27D-407. The bank's referral certainly constituted an adequate factual predicate for the filing of the protective services application by the Office on Aging which is more than sufficient *100 to reject any contention that the application was frivolous.
After entry of the May 8 order, Mr. Farnkopf was examined by a board certified psychiatrist who opined that Mr. Farnkopf's "ability to think abstractly is markedly impaired as is his insight and judgement," and concluded that he was not competent to make financial decisions. As a result, an order was entered on May 11, 2001, again buttressed by the same conclusory findings contained in the May 8 order. The May 11 order, however, while continuing the injunction against caretaker interference, was modified to allow the caretaker to have contact with Mr. Farnkopf. The order also permitted an examination to be conducted by a physician acceptable to Garbini. In accordance with N.J.S.A. 52:27D-414e, this order was not to exceed 30 days and, thus, the matter was scheduled to return to court on June 11, 2001. Again, this order was amply supported by the findings of the psychiatrist and there is no evidence in the record to suggest that it was based upon some ulterior motive inconsistent with the good faith pleading requirements of N.J.S.A. 2A:15-59.1. Like the May 8 order, the Chancery judge again recited in the May 11 order that Mr. Farnkopf was "a vulnerable adult in need of protective services" as a result of "exploitation" by another.
On June 7, 2001, a proposed order was presented to the Chancery judge extending the May 11 order for an additional 30 days, with the representation of counsel for the Office on Aging that all counsel, including Garbini, had consented to its entry. In addition, by this time, Mr. Farnkopf had engaged the services of an attorney, who advised the lower court that his client, as of May 29, 2001, did not "dispute the need for protective services." Presumably, the Chancery judge continued the May 11 order for an additional 30 days, since the matter did not come back before the court until July 11, 2001. The continuation of the May 11, 2001 order up to and including July 11, 2001 was unopposed and, indeed, consented to by all the participants, including Mr. Farnkopf's own privately-retained attorney, even though another physician had by then opined that Mr. Farnkopf was competent to make and understand his financial decisions. These circumstances preclude a finding that the basis for the Office on Aging's application for the continuation of the May 11 order was frivolous. A party who knowingly consents to an application for relief should not later be heard to complain that the application was frivolous.
Once the hearing was adjourned, with consent, no further application was made by the Office on Aging and the matter dismissed on July 11, 2001 for reasons not revealed by this record.
In considering the content of the orders and this matter's procedural history, we find nothing in the Office on Aging's pursuit of the protective services action which remotely supports an argument that its pleadings were filed in bad faith or for purposes of harassment, delay or malicious injury, and we find no evidence that the Office on Aging knew or should have known that its applications for emergent relief were without "any reasonable basis in law or equity" or "could not be supported by a good faith argument for an extension, modification or reversal of existing law." N.J.S.A. 2A:15-59.1b(2) Our examination of the information before the Chancery judge at the time he entered the May 8 and 11, 2001 orders, and at the time he permitted the May 11, 2001 order to continue until July 11, 2001, demonstrates that the Office on Aging acted reasonably and appropriately. The factual information then available strongly suggested that Mr. Farnkopf was a vulnerable adult in *101 need of protective services. It was not until the rendering of Dr. Auerbach's report of May 24, 2001containing the opinion that Mr. Farnkopf was oriented to time, place and person, showed no signs of dementia and was "able to attend to his own personal and financial affairs"that there was any evidence presented which contradicted the medical opinion and factual information obtained by the Office on Aging. Dr. Auerbach's report, however, only created a factual dispute as to whether Mr. Farnkopf was a vulnerable adult; it did not trump the existing information or demonstrate that the Office on Aging's position as to Mr. Farnkopf's vulnerability was without a basis in fact or law. Even so, armed with Dr. Auerbach's report, neither Mr. Farnkopf nor Garbini sought the vacating of the existing protective services order or the termination of that action. Instead, all counsel consented to an order continuing the provisions of the May 11 order for an additional 30 days. And, as noted earlier, privately-retained counsel for Mr. Farnkopf advised the Chancery judge on May 29, 2001 that he had no present dispute about "the need for protective services" (emphasis added). These factual and procedural circumstances overwhelmingly negate any finding that the Office on Aging acted frivolously.
We are also uneasy about viewing the relationship between the Office on Aging and Garbini as the type of adversarial relationship envisioned by the frivolous litigation statute. A successful N.J.S.A. 2A:15-59.1a(1) movant must not only be a "party" but also a "party who prevails."
We do not view Garbini as a "party" within the intendment of the statute. We have generally defined a "party" as "the person or entity beneficially interested or personally sought to be held liable." Kasharian v. Wilentz, 93 N.J.Super. 479, 482, 226 A.2d 437 (App.Div.1967). Garbini played an important function in preserving assets, but his role was limited and non-adversarial. As described in the order, Garbini was only to "take custody of the assets (non-real estate) of Allen Farnkopf, protect them from dissipation and report to the court." Accordingly, we conclude Garbini was not a person "beneficially interested" in the action. Ibid. He was a custodian of assets and not an advocate of any particular position concerning the merits of the suit. There is also nothing about the eventual dismissal of the protective services action which would suggest that Garbini "prevailed" in the action.[10]
For these reasons, we find that the order in question cannot be justified by reference to either R. 1:4-8 or N.J.S.A. 2A:15-59.1.

VII
R.4:42-9(a)(8) also permits counsel fees to be awarded where "permitted by statute." Our review of the Act compels the conclusion that it does not authorize an award of fees against entities or persons such as the Office on Aging.
The only aspect of the Act which might be construed as authorizing the award of fees can be found in N.J.S.A. 52:27D-418, which permits a court to "order payments to be made by or on behalf of the vulnerable adult for protective services from his *102 own estate." While it does not expressly include attorneys' fees as a type of payment therein covered, this provision only permits the ordering of payments from the vulnerable adult's "own estate." Thus, any authority to make such an award does not extend to compelling another litigant or any other person or party to bear such fees, just the estate itself.
In addition, the Act renders protective service providers and their employees "immune from criminal and civil liability when acting in the performance of their official duties." N.J.S.A. 52:27D-409e. The only exceptions to immunity, which have no basis in this record, are when providers or their employees engage in "conduct ... outside the scope of their employment, or [which] constitutes a crime, actual fraud, actual malice, or willful misconduct." Ibid. This grant of immunity demonstrates the Legislature's obvious desire to render those who pursue the laudatory goals of the Act free from liability for the costs or fees incurred by other persons or parties.
Because of the important role played by the Office on Aging in investigating referrals and seeking the protection of vulnerable adults from abuse, neglect or exploitation, and because no support for the shifting of fees and costs to the Office on Aging can be found in the Act itself, we find no basis for the order in question.

VIII
The order compelling the payment of Garbini's fees by the Office on Aging is reversed and the matter remanded for the entry of an order requiring that these fees be paid from the assets of Allen Farnkopf.
NOTES
[1] N.J.S.A. 52:27D-406 to -425.
[2] Docket No. CP-0040-01.
[3] The record before us reveals an insufficient basis for the appointment of counsel. The order itself mistakenly cites R.4:86-4(b) (emphasis added) which directs that the order for hearing in guardianship actions "shall include the appointment by the court of counsel for the alleged mentally incapacitated person." This was not a guardianship action but an action for the appointment of a conservator, and the Chancery judge should have been guided by R.4:86-11(b) (emphasis added) (the court "may appoint counsel for the conservatee if it concludes that counsel is necessary to protect his or her interests") and N.J.S.A. 3B:13A-3 (emphasis added) (the court "shall have the right to appoint counsel for the proposed conservatee if it believes that counsel is necessary to adequately protect the interests of the conservatee"). Since Mr. Farnkopf had already retained counsel for purposes of the protective services action, the court's appointment of another attorney to represent Mr. Farnkopf in the conservatorship action was unnecessary. In Re Adoption of a Child by E.T., 302 N.J.Super. 533, 541, 695 A.2d 734 (App.Div.), certif. denied, 152 N.J. 12, 702 A.2d 351 (1997); R.K. v. A.J.B., 284 N.J.Super. 687, 696-97, 666 A.2d 215 (Ch.Div.1995).
[4] N.J.S.A. 3B:12-1 to -66. The procedures to be followed in such matters are set forth in R. 4:86-1 to -10.
[5] N.J.S.A. 3B:13A-1 to -36. The procedures to be followed in such matters are set forth in R. 4:86-11.
[6] While the Legislature amended N.J.S.A. 3B:1-2 in 1997 to replace the use of "incompetent" with "incapacitated", many of the guardianship and conservatorship statutes, including N.J.S.A. 3B:13-1, still use the former term.
[7] Of course, both appointments may be terminated for reasons other than death. Conservatorships may be terminated upon application of the conservatee, N.J.S.A. 3B:13A-33, or upon the conservatee having been adjudicated an incapacitated person, N.J.S.A. 3B:13A-34. A guardianship may be terminated upon the ward's return to competency. N.J.S.A. 3B:12-28.
[8] "Abuse" is defined as "the willful infliction of physical pain, injury or mental anguish, unreasonable confinement, or the willful deprivation of services which are necessary to maintain a person's physical and mental health." N.J.S.A. 52:27D-407. "Neglect" is defined as "an act or failure to act by a vulnerable adult or his caretaker which results in the inadequate provision of care or services necessary to maintain the physical and mental health of the vulnerable adult, and which places the vulnerable adult in a situation which can result in serious injury or which is life-threatening." Ibid. "Exploitation" is defined as "the act or process of illegally or improperly using a person or his resources for another person's profit or advantage." Ibid.
[9] We would likewise caution against the use of "receiver" to describe such a judicially-created office. The word "receiver" normally connotes a person or entity who takes title to property in custodia legis, which certainly would not appear to be appropriate in an action, such as an adult protective services action, where the court's intervention is only temporary. N.J.S.A. 52:27D-415. The use of the word "receiver" in this context, in fact, could prove more onerous than protective, as it would likely have a detrimental impact on a vulnerable adult's credit status. See, e.g., Roach v. Margulies, 42 N.J.Super. 243, 245-46, 126 A.2d 45 (App.Div.1956).
[10] N.J.S.A. 2A:15-59.1 expressly states that a prevailing "party" may be awarded counsel fees if the pleading of the non-prevailing "person" was frivolous. We note but need not resolve the conflict between Matter of K.L.F., 275 N.J.Super. 507, 646 A.2d 532 (Ch.Div. 1993) and Div. of Youth & Fam. Serv. v. P.M., 301 N.J.Super. 80, 693 A.2d 941 (Ch.Div. 1997) as to whether a public body (in those cases, the Division of Youth and Family Services) may be found to be a non-prevailing "person."