NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2563-21
A-2652-21

IN THE MATTER OF A.D.,
an alleged incapacitated person.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **November 29, 2023** |
| APPELLATE DIVISION |

Argued October 12, 2023 – Decided November 29, 2023

Before Judges Vernoia, Gummer, and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Sussex County, Docket No. P-000982-20.

Brian C. Lundquist, appellant in A-2563-21, argued the cause pro se.

Steven J. Kossup, appellant in A-2652-21, argued the cause pro se.

William G. Johnson argued the cause for respondent County of Sussex Division of Social Services, Office of Adult Protective Services (Johnson & Johnson, attorneys; William G. Johnson, of counsel and on the briefs).

The opinion of the court was delivered by

GUMMER, J.A.D.

In this guardianship action, which was initiated by the Office of Adult Protective Services (APS), court-appointed attorney Steven J. Kossup, Esq.,

and court-appointed temporary guardian Brian C. Lundquist, Esq., appeal from an order denying their respective applications for fees and costs. Having consolidated their appeals, we now affirm.

I.

On June 2, 2020, an attorney representing APS of the Sussex County Division of Social Services filed a verified complaint seeking temporary and permanent guardianship of an alleged incapacitated and vulnerable adult, A.D. (Hank), pursuant to N.J.S.A. 52:27D-416.[1] According to APS, Hank sustained a traumatic brain injury in 1978 and had been living alone since his father passed away on April 7, 2020.

APS submitted with the complaint reports and certifications prepared by two doctors, Douglas A. Ballan and Elda P. Sancho Mora, who had interviewed and evaluated Hank. Dr. Ballan concluded Hank was unable to manage his medical, legal, or financial affairs and needed a guardian. Dr. Mora concluded Hank lacked sufficient capacity to govern himself or manage his affairs and that he needed a guardian of the person and estate.

APS also submitted a certification of assets and stated in the complaint it had conducted pursuant to Rule 4:86-2 "a reasonably diligent inquiry regarding

_____

[1] We use initials and a fictitious name to protect the privacy interests of the subject of this guardianship case, to maintain the confidentiality of the record, and for ease of reading. See R. 1:38-3(e).

A-2563-21

the real and personal property and income of [Hank]" and found he had no savings or significant assets. As for his income, APS asserted "[Hank] was receiving $671.00 monthly from Social Security Disability and $163.25 in Supplemental Security Income directly deposited into his checking account until it was mistakenly terminated. He currently has no income."

In addition to "seeking the appointment of a permanent guardian of the person and estate" pursuant to N.J.S.A. 52:27D-416 and N.J.S.A. 3B:12-24.1(b), APS in the complaint requested the appointment of an attorney and a temporary guardian for Hank:

> 43. Pursuant to . . . Rule 4:86-4, APS is requesting the appointment of an attorney for [Hank], that the attorney be compensated from the Estate, if any, of [Hank], and that APS bear no responsibility for the costs and fees associated with the appointment of an attorney for [Hank] pursuant to N.J.S.A. 52:27D-409.
>
> 44. Pursuant to N.J.S.A. 3B:12-24.1(c), APS is requesting the appointment of [a] temporary guardian for [Hank], that the temporary guardian be compensated from the Estate, if any, of [Hank] pursuant to N.J.S.A. 3B:12-24.1(c)(9), and that APS bear no responsibility for the costs and fees associated with the appointment of a temporary guardian for [Hank] pursuant to N.J.S.A. 52:27D-409.

Paragraph (a)(8) of Rule 4:86-4 requires the court to appoint an attorney for the alleged incapacitated person if that person is not represented by counsel. Paragraph (e) provides: "The compensation of the attorney for the

3

party seeking guardianship, appointed counsel, and of the guardian ad litem, if any, may be fixed by the court to be paid out of the estate of the alleged incapacitated person or in such other manner as the court shall direct." Pursuant to N.J.S.A. 3B:12-24.1(c), a court may appoint a temporary guardian in a guardianship matter. Paragraph (9) of N.J.S.A. 3B12-24.1(c) authorizes a court to award a temporary guardian "reasonable fees for his services, as well as reimbursement of his reasonable expenses, which shall be payable by the estate of the alleged incapacitated person or minor."

The Sussex County surrogate executed an "order" dated June 11, 2020, scheduling a hearing to take place on July 14, 2020, before a Superior Court judge.[2] In the order, the surrogate appointed Kossup as Hank's attorney, directing him to interview Hank, conduct certain inquiries regarding him, and "prepare a written report of findings and recommendations (and, if applicable, an affidavit of services) to be filed with the [c]ourt . . . ." The following language appeared beneath the appointing paragraph:

_____
[2] Why the surrogate, and not the Superior Court judge, executed the order is not clear to us. Rule 4:86-3A(a) requires "the [s]urrogate" prior to docketing a complaint seeking a guardianship for an alleged incapacitated person to "review the complaint to ensure that proper venue is laid and that it contains all information required by R. 4:86-2." However, Rule 4:86-4(a) requires "the court" to "enter an order fixing a date for hearing" provided "the court is satisfied with the sufficiency of the complaint and supporting affidavits and that further proceedings should be taken thereon."

SELECT ONE:

_____ The attorney appointed to represent the alleged incapacitated person is appointed pro bono (without cost);

OR

_____ The attorney appointed to represent the alleged incapacitated person is to be paid. Pursuant to R. 4:86-4(d) the court may direct that counsel be paid from the assets of the alleged incapacitated person or in such manner as the court shall direct.

A check mark appeared next to the second paragraph. Although it references paragraph (d) of Rule 4:86-4, the language of that paragraph tracks paragraph (e) of the Rule.

Pursuant to N.J.S.A. 3B:12-24.1, the surrogate appointed Lundquist as Hank's temporary guardian. The surrogate set forth in the order Lundquist's authority as temporary guardian, including the authority "to arrange interim financial, social, medical or mental health services . . . for [Hank] determined to be necessary to deal with critical needs of or risk of substantial harm to [Hank] or [his] property or assets." The order authorized the temporary guardian "to make arrangements for payment for such services from [Hank's] estate." The order said nothing about any compensation for Lundquist as temporary guardian.

A copy of the order and a filed copy of the verified complaint were sent to APS's counsel and appellants. Although no motion had been filed to strike any language in the verified complaint, in the returned, filed copy of the verified complaint, the language in paragraphs forty-three and forty-four providing that APS bore "no responsibility for the costs and fees associated with the appointment of" an attorney or temporary guardian was crossed out. A handwritten note dated June 11, 2020, appeared next to the crossed-out portion, stating "per" and the initials of the Superior Court judge assigned to the case. Counsel for APS sent a three-page letter dated June 16, 2020, to the judge, the surrogate, and appellants, "object[ing] to the unilateral amendment of the [c]omplaint without providing [APS's counsel] an opportunity to be heard on the issue," "advis[ing]" appellants of APS's position, and explaining that position with citation to case law, statutory law, and court rules. According to APS's counsel, he did not receive any response to that letter.

On September 8, 2020, Kossup filed an "interim report," in which he concurred that Hank "is in need of a plenary guardian" and discussed possible outcomes and living arrangements for him. In an October 5, 2020 supplemental report, Kossup confirmed Hank had no significant assets and his only source of income was social security. Kossup again recommended the appointment of a plenary guardian for Hank. In a February 11, 2021 "updated

6

recommendation," Kossup withdrew his prior recommendation for a plenary guardian. He contended Hank was receiving services and no longer needed a guardian. He stated he had spoken with Dr. Ballan, who indicated "a guardianship would be unnecessary if [Hank] could maintain his current independent living style and the assistance continued." In a February 11, 2021 letter to the surrogate, Kossup relayed a conversation he had had with Dr. Mora in which he advised her Hank was "under a service plan through various agencies" and she responded Hank did not need a guardian with that assistance.

Dr. Ballan submitted a report dated February 12, 2021, stating he had performed a follow-up telephone interview with Hank at the request of an APS social worker. Dr. Ballan found no reason to change his initial impression that Hank had "ongoing cognitive deficits and executive dysfunction which would make complex decision-making difficult or impossible for him." He concluded Hank was "still not able to independently manage his medical, legal or financial affairs" and was "appropriate for guardianship."

On February 17, 2021, Lundquist filed a certification in which he stated that despite his history of traumatic brain injury, Hank "present[ed] as incredibly high functioning, and objectively capable of independently managing many aspects of his daily personal life, which he continues to do

A-2563-21

today." Lundquist indicated that efforts to identify a willing guardian for Hank had been unsuccessful in part because Hank was "comparatively high functioning." Lundquist detailed the "network of replacement services and benefits" that had been obtained for Hank and that "objectively appear[ed] to be very successfully promoting [Hank's] ability to thrive in the least restrictive environment possible." Lundquist opined Hank did "not require the appointment of a permanent, plenary guardian at this time" and recommended "his current course of services, supervision and benefits should be permitted to continue."

At the request of the social worker, Dr. Mora interviewed Hank again on March 8, 2021, and issued a report dated March 10, 2021, in which she found him to be "in a better condition" than when she first had evaluated him but concluded "his cognitive deficits remained" and he was "unable to care for his property and himself, and he [was] in need of a guardian [of] person and property."

Lundquist arranged for psychologist Leslie J. Williams to evaluate Hank. After examining Hank on May 19, 2021, Dr. Williams issued a report and certification on June 17, 2021. He described Hank as having "mild limitations in adaptive functioning and decision making" and concluded Hank did "not require the appointment of a general guardian" and instead was "appropriate

for a limited guardianship in the legal and medical domains." On July 20, 2021, Lundquist submitted a supplemental certification in which he summarized Dr. Williams's report, repeated his conclusion that Hank did not need a "permanent, plenary guardian at this time," and recommended "at most, the appointment of a limited guardian . . . for 'legal' and 'medical' decisions only thereby preserving and protecting [Hank's] ongoing, independent right to make his own 'residential,' 'vocational' and 'educational' decisions."

During a July 22, 2021 hearing before the Superior Court judge, counsel for APS confirmed APS had consented to modify its application to one for a limited guardianship of Hank's person. Lundquist and Kossup confirmed they recommended the appointment of a limited guardian for legal and medical purposes.

In a decision placed on the record that day, the judge reviewed the reports submitted to the court and found Hank "was capable of making decisions in many areas of his life independently but does require a limited guardian in the area of legal- and medical-decision making." The judge noted Hank's agreement to the appointment of a limited guardian. The judge praised all involved, including Lundquist, Kossup, and the APS social worker. The judge described the APS social worker as being "the hero of the day . . . who has done so much work to assist [Hank] and to get him to where we are today."

A-2563-21

The judge praised APS for becoming "involved right away and [getting] services right away to [Hank] that really changed the outcome of this case." The judge subsequently entered a "judgment of legal incapacity" in which she found Hank to be "an incapacitated person . . . unfit and unable to govern himself and manage his affairs in some, but not all areas" and appointed the Bureau of Guardianship Services as a limited guardian of the person, authorized to act "in the areas of legal and medical decisions requiring informed consent."

After rendering her decision on the record, the judge raised the issue of the fee applications submitted by appellants. Counsel for APS did not object to the amount of the fees but opposed the request that APS pay the fees. The judge gave counsel an opportunity to submit briefs on the issue.

In a July 21, 2021 certification, Kossup stated he had billed Hank a total of 13.7 hours at a reduced hourly rate of $275 and, thus, requested payment of $3,767.50 in fees. In a July 22, 2021 certification, Lundquist stated he had billed Hank a total of forty-four hours at an hourly rate of $295 and, thus, requested payment of $12,980 in fees. He also sought $2,032.18 in expenses, which consisted of $1,500 in expert fees and $532.18 in unspecified photocopy, telephone, and postage charges.

In opposition to the fee applications, APS submitted the certification of Joan M. Bruseo, the director of the Sussex County Division of Social Services. She testified about the services provided by her organization and detailed the impact a decision to award fees to court-appointed attorneys and temporary guardians would have on its ability to serve its clients. According to Bruseo, her organization uses APS funding for, among other things, "[e]mergency [s]helter for individuals in need of immediate safe housing, home health aides, and [p]hysician [a]ssessments."

Bruseo testified the Division of Aging of the New Jersey Department of Human Services had allocated in 2021 to Sussex County for APS services $85,808 from federal grants and "[t]he balance of the costs of salaries and benefits was absorbed directly by Sussex County." According to Bruseo, for the 2020 budget, $20,000 was allocated for direct client services and for 2021 the salaries of four employees totaled $187,544 plus benefits she estimated to be $26,000 per person. Bruseo certified her organization had received 150 APS referrals and had filed three guardianship actions in 2020. According to Bruseo, "[t]here is not enough money in [the] APS budget to pay for court appointed attorneys or temporary guardians" and "[i]f we were forced to allocate funding to pay attorneys the simple bottom line is that the clients'

11

care, health, and wellbeing will suffer." During argument, Lundquist suggested Sussex County had sufficient funds to pay counsel fees.

After hearing argument, the judge entered on March 28, 2022, an order with a statement of reasons denying the fee applications. While praising appellants for their "herculean efforts" and "remarkable results," the judge found APS had "acted in accordance with its mandate" and that "nothing in this matter provides the misfeasance by a state agency or otherwise extraordinary circumstances necessary to warrant fee-shifting of the court-appointed attorneys' counsel fees to a state agency." Recognizing "APS was created by the legislature" with "a mandate to serve vulnerable adults in the state," the judge declined to interpret Rule 4:86-4(e) to provide for the payment of the fees of court-appointed attorneys "in every case, or even in most cases" because to do so "would equate to the court engaging in impermissible legislative revision" given that "[t]he legislature did not fund the legal representation of [alleged incapacitated persons] in enacting [the APS] statute."

On appeal, appellants argue the judge erred by misinterpreting In re Guardianship of DiNoia, 464 N.J. Super. 562, 567 (App. Div. 2019), and In re Farnkopf, 363 N.J. Super. 382, 389 (App. Div. 2003), and by requiring a finding of extraordinary circumstances or "state agency misfeasance" for an

award of fees under Rule 4:86-4(e).  Kossup also argues the judge was required to award him fees pursuant to the June 11, 2020 order and the strike marks on the returned copy of the verified complaint.  Perceiving no misapplication of the law or abuse of discretion in the judge's denial of the fee applications, we affirm.

## II.

"We review the trial court's award of fees and costs in accordance with a deferential standard." Hansen v. Rite Aid Corp., 253 N.J. 191, 211 (2023).  "Such an award 'will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion.'" Id. at 211-12 (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)).  "An appellate court may reverse a trial court's award of fees and costs for abuse of discretion when the court's decision 'was based on irrelevant or inappropriate factors, or amounts to a clear error in judgment.'" Id. at 212 (quoting Garmeaux v. DNV Concepts, Inc., 448 N.J. Super. 148, 155-56 (App. Div. 2016)).

We review de novo a trial court's determination of law, including a trial court's interpretation of a court rule. Hansen, 253 N.J. at 212.  In "review[ing] the meaning or scope of a court rule de novo, [we] apply[] 'ordinary principles of statutory construction to interpret the court rules.'" DiFiore v. Pezic, 254 N.J. 212, 228 (2023) (quoting State v. Robinson, 229 N.J. 44, 67 (2017)).

Rule 4:42-9 sets forth "eight enumerated circumstances" in which a court may award attorneys' fees.  Innes v. Marzano-Lesnevich, 224 N.J. 584, 592 (2016).  Appellants contend they are entitled to fees pursuant to paragraph (a)(3) of Rule 4:42-9.  In Farnkopf, we reversed an order requiring the Office on Aging to pay the fees of a court-appointed "interim conservator/guardian" in part because we found Rule 4:42-9(a)(3) did not support that fee award. 363 N.J. Super. at 385, 395-96, 404.  After we decided Farnkopf, Rule 4:42-9(a)(3) was amended in 2006 to include the following sentence:  "In a guardianship action, the court may allow a fee in accordance with R. 4:86-4(e) to the attorney for the party seeking guardianship, counsel appointed to represent the alleged incapacitated person, and the guardian ad litem."

Rule 4:86-4(e) provides:  "The compensation of the attorney for the party seeking guardianship, appointed counsel, and of the guardian ad litem, if any, may be fixed by the court to be paid out of the estate of the alleged incapacitated person or in such other manner as the court shall direct."  Given Hank's lack of assets, appellants focus on the last part of the Rule – "in such other manner as the court shall direct" – and contend the judge, based on that language, should have directed APS to pay their fees.  The problem with that contention is that in APS's enabling statute, the Adult Protective Services Act

(the Act), N.J.S.A. 52:27D-406 to -425, the Legislature did not give courts the authority to order APS to pay fees under these circumstances.

As the judge correctly recognized, APS was created by statute. In analyzing the Act that created it, we held in Farnkopf, 363 N.J. Super. at 403:

> Our review of the Act compels the conclusion that it does not authorize an award of fees against entities or persons such as the Office on Aging.
>
> The only aspect of the Act which might be construed as authorizing the award of fees can be found in N.J.S.A. 52:27D-418, which permits a court to "order payments to be made by or on behalf of the vulnerable adult for protective services from his own estate." While it does not expressly include attorneys' fees as a type of payment therein covered, this provision only permits the ordering of payments from the vulnerable adult's "own estate." Thus, any authority to make such an award does not extend to compelling another litigant or any other person or party to bear such fees, just the estate itself.

The language of N.J.S.A. 52:27D-418 remains the same and provides for payment only from the vulnerable person's "own estate." Similarly, N.J.S.A. 3B:12-24.1(c)(9) provides for payment of a temporary guardian's fees and costs only from "the estate of the alleged incapacitated person."

In Farnkopf, 363 N.J. Super. at 403, we also considered the immunity provision of N.J.S.A. 52:27D-409(e):

> In addition, the Act renders protective service providers and their employees "immune from criminal and civil liability when acting in the performance of

15

their official duties."  N.J.S.A. 52:27D-409(e).  The only exceptions to immunity, which have no basis in this record, are when providers or their employees engage in "conduct . . . outside the scope of their employment, or [which] constitutes a crime, actual fraud, actual malice, or willful misconduct." Ibid. This grant of immunity demonstrates the Legislature's obvious desire to render those who pursue the laudatory goals of the Act free from liability for the costs or fees incurred by other persons or parties.

The language of N.J.S.A. 52:27D-409(e) remains the same and prohibits a court from ordering payment from APS unless APS's or APS's employees' conduct was "outside the scope of their employment, or constitutes a crime, actual fraud, actual malice, or willful misconduct."

Appellants urge us to disregard Farnkopf, 363 N.J. Super. 382, and focus instead on DiNoia, 464 N.J. Super. 562.  But we perceive no conflict in those decisions.  In DiNoia, we affirmed an order requiring APS to pay the fees of the court-appointed counsel for the alleged incapacitated person.  The trial judge found APS had failed to carry out its statutory duties, specifically that APS had failed to conduct the financial investigation and analysis it was required to perform under Rule 4:86-2(b), had thereby protracted the litigation, and had ignored requests to produce records.  DiNoia, 464 N.J. Super. at 566, 569.  Given that misconduct, we found no abuse of discretion in the trial court's decision to require APS to pay the attorneys' fees.

16

As the judge found, APS did not engage in any misconduct in this case. After it learned of Hank's circumstances, APS filed a guardianship complaint in accordance with its statutory authority set forth in N.J.S.A. 52:27D-416. Following Rule 4:86-2, APS submitted with the complaint a certification of assets and the certifications of two qualified physicians. Appellants seem to fault APS for initially seeking a full and not limited guardianship, but both physicians opined Hank lacked capacity to govern his affairs and needed the appointment of a plenary guardian and Kossup in his first and second reports concurred that Hank was in need of a plenary guardian.

We now turn to address briefly Kossup's argument the judge was required to award him fees based on the June 11, 2020 order. Kossup contends he relied on the sentence in the order stating, "[t]he attorney appointed to represent the alleged incapacitated person is to be paid." He apparently viewed that language as a promise of payment and disregarded what he described as "the qualifier" in the next sentence, which makes clear the court's discretion: "the court may direct that counsel be paid from the assets of the alleged incapacitated person or in such manner as the court shall direct." (Emphasis added).[3]  Kossup also mischaracterizes the order as "the Court's

_____

[3] The language in the form of order used by the surrogate follows the language contained in the 2017 form order. See Super. Ct. of N.J., CN 12013, Order

own order." In fact, the order was issued by the surrogate, not the Superior Court judge who ultimately decided the case. The judge was not bound by the surrogate's order and was free to use her discretion in deciding the fee applications. See Lombardi v. Masso, 207 N.J. 517, 534 (2011) (discussing a trial court's inherent authority to modify its interlocutory orders).

And any reliance on the marks striking language on the returned copy of the verified complaint was misplaced. Neither the court nor the surrogate had authority to sua sponte strike language from the complaint with no pending motion, no notice to the parties, and no opportunity for APS to hear and respond to the concerns that led the court or surrogate to strike the language.

Although pursuant to Rules 4:42-9(a)(3) and 4:86-4(e), the judge may have had the authority to grant a fee application "in such other manner as the

_____

Fixing Guardianship Hearing Date and Appointing Attorney for Alleged Incapacitated Person (Feb. 2017). A revised version of that form order was issued on April 14, 2023, pursuant to Directive #06-2023 of the Administrative Office of the Court. See Admin. Off. of the Cts., Admin. Directive #06-23, Guardianship of Incapacitated Adults attach. 4, at 28 (Apr. 14, 2023). In the prior and current versions of the form order, paragraph 5 erroneously cites paragraph (d) of Rule 4:86-4 instead of paragraph (e). They also contain a sentence, "the attorney appointed to represent the alleged incapacitated person is to be paid," which, if taken in isolation and without consideration of the language from the following sentence, "the court may direct that the appointed attorney be paid . . . [,]" could result in an attorney, like Kossup, indicating he was promised payment. We respectfully suggest the Supreme Court Civil Practice Committee review the form order for possible revisions to correct the citation and avoid any possible misapprehensions.

court shall direct," the judge did not have the authority to grant appellants' fee applications in the manner – payment by APS – appellants had requested. Accordingly, we perceive no misapplication of law or abuse of discretion in the judge's decision, and we affirm the order denying appellants' fee applications.

In reaching that conclusion, we are mindful of the temporal and financial sacrifices appellants and their firms made in their laudable efforts on behalf of Hank, the court, and the legal profession in this case. We acknowledge in particular Lundquist's firm's payment of Dr. Williams's fee. We join the judge in her praise and expressions of gratitude, but given the applicable statutes and court rules, we can do no more. Like our Supreme Court, we "have no license to amend" statutes, and, unlike our Supreme Court, we have no constitutional authority to create court rules "to make our civil justice system more fair." DiFiore, 254 N.J. at 228.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19