803 A.2d 694 (2002)
353 N.J. Super. 580
In the Matter of Marguerite SEYSE, Deceased.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 2002.
Decided August 6, 2002.
*695 Thomas A. Zelante, Dover, argued the cause for appellant Judith Oehler (Seeber, Bowkley & Zelante, attorneys; Mr. Zelante, of counsel and on the brief).
Michael Bolton, Morristown, argued the cause for respondent Ellenor Olson.
Before Judges STERN, COLLESTER and PARKER.[1]
The opinion of the court was delivered by
COLLESTER, J.A.D.
Appellant Judith Oehler appeals from an order of the Chancery Division determining that decedent Marguerite Seyse died while domiciled in the State of Connecticut and transferring probate jurisdiction to that State. We affirm.
When she died in 1999, Marguerite Seyse had two surviving daughters: Ms. Oehler, who lived in New Jersey, and Ellenor Olson, who resided in Connecticut. The record clearly establishes that the relationship between the two sisters was marked by distrust and hostility.
In 1994 while Ms. Seyse was a resident of Senior Quarters, an assisted living facility in Montville, New Jersey, Ms. Oehler commenced an action to declare her mother mentally incompetent and for appointment as guardian of her person and property. A counterclaim was filed by her sister. On January 26, 1994, Judge Reginald Stanton signed an order determining that Marguerite Seyse was a mental incompetent incapable of managing her affairs or governing herself including the ability to consent to medical treatment. Judge Stanton appointed Ellenor Olson, Judith Oehler and her husband, John W. Oehler, as co-guardians of the person and property of Marguerite Seyse. Ms. Oehler was to have the single authority to make disbursements in amounts less than $500 for her mother's ordinary living expenses *696 and to make disbursements in amounts greater than $500 solely for her room and board. Because of the demonstrated inability of the two sisters to agree, Judge Stanton appointed Kathleen N. Fennelly, Esq. as arbitrator of disputes among the co-guardians.
On April 17, 1998, Ms. Seyse, then eighty-eight, was removed from Senior Quarters because of disruptive behavior and placed in the psychiatric unit of Chilton Memorial Hospital. Senior Quarters advised the co-guardians that they would not permit Ms. Seyse to return.
Without the consent of the court or the other co-guardians, Ms. Olson removed her mother from the hospital and brought Ms. Seyse to live with her at her home in Connecticut. Ms. Oehler then moved before the Chancery Division to remove Ms. Olson as a co-guardian, and Ms. Olson in turn filed a cross-motion to remove the Oehlers. Ms. Fennelly, the appointed arbitrator, applied for an order listing the New Jersey address of the Oehlers as the address of record for all of Ms. Seyse bank accounts; freezing Ms. Seyse' assets; and directing that Ms. Seyse live with the Oehlers in New Jersey until such time as a permanent placement could be found. Ms. Olson commenced an action in Connecticut to appoint a conservator for her mother. Prior to ruling on the application, Judge MacKenzie appointed Nancy M. Bangiola, Esq. as guardian ad litem for Marguerite Seyse with a direction to interview all parties and submit a report to the court.
Ms. Bangiola visited with Ms. Seyse at the Olson home in Milford, Connecticut. Ms. Seyse told Ms. Bangiola that she liked living with Ms. Olson, did not wish to live with the Oehlers, and said she suspected that Ms. Oehler was guilty of some wrongdoing with regard to her money. Ms. Bangiola stated in her report that "although it appeared to me that Mrs. Seyse remains unable to care for herself or manage her affairs, she was able to express a clear preference in living arrangements. Her preference is not unreasonable."
Ms. Olson told Ms. Bangiola that she had planned to take Ms. Seyse to Connecticut only temporarily, but she felt so frustrated by the dismissal of her suggestions regarding her mother's care that she decided to go to court in Connecticut so that her mother could permanently reside with her. She said that the co-guardianship arrangement was not working even with Ms. Fennelly as arbitrator. She was amenable to the appointment of a third party as guardian of her mother's property but felt she should be appointed sole guardian of her person.
Ms. Bangiola also met with Ms. Oehler, who said that her sister's motives in taking Ms. Seyse out of state were "not pure." Ms. Oehler suggested a care center in Morris Plains that would be a suitable residence for her mother. She did agree with her sister on one point, namely, that the co-guardianship was not working and could not work. She agreed to the idea of appointment of a neutral third party as custodian of the property, but she believed that she should be the sole guardian of the person.
Ms. Bangiola recommended to the court that there be a change in the co-guardianship arrangement and that Ms. Seyse should remain living at the Connecticut residence with Ms. Olson since "my client has expressed a clear desire to stay in Connecticut with Mrs. Olson."
Ms. Fennelly certified to the court that she had been denied permission to visit Ms. Olson's home in Milford, Connecticut until June 11, 1998, when she visited the residence following a hearing in the Milford Probate court. Her observations were that the house was clean, relatively *697 safe and that Ms. Seyse appeared "happy and comfortable there."
On November 9, 1998, Judge MacKenzie dissolved the co-guardianship, appointed Olson guardian of the person of Ms. Seyse and Oehler as guardian of her property. He said that while he shared the concern of Ms. Bangiola and Ms. Fennelly regarding the actions of Ms. Olson in removing her mother from the State without authorization, he gave the following rationale for her appointment as guardian of her mother's person:
[T]he court has decided to appoint Ms. Olson nonetheless, with a strong admonition concerning the ultimate authority of the court as to guardian and her obligation to be accountable at all times. It seems clear that Olson is devoted to ensuring that the mother receives the best care, and that she enjoys the best quality of life in her own home, and the extensive measures she has taken to ensure that her mother is safe, properly cared for and happy in that home, certainly supports the finding that Olson has the best interests of her mother at heart, and that she is willing to take responsibility for her care. The court regards this residential setting as preferable for Mrs. Seyse as compared to what Mrs. Oehler has planned for her mother. (Emphasis in original.)
Mrs. Seyse died on April 27, 1999, while still living with Ms. Olson in Connecticut. At that time her total assets exceeded $830,000. On May 7, 1999, ten days after her mother's death, Ms. Olson filed a caveat protesting the admission to probate any reported will of Marguerite Seyse in New Jersey. The action was directed to a will in the possession of Ms. Oehler purportedly executed by Ms. Seyse on February 11, 1987 in Erie County, New York which granted a $5,000 bequest to Ms. Olson and left the remainder of the estate to Ms. Oehler. Ms. Olson submitted another will to the County of New Haven Probate Court, purportedly signed by Ms. Seyse on February 28, 1997, while she was still living in New Jersey.
Motions were filed by both sisters before Judge MacKenzie. Ms. Olson sought transfer of probate jurisdiction of her mother's estate to Connecticut, and Ms. Oehler sought to vacate the caveat so that probate could take place in New Jersey. On June 29, 2000, Judge MacKenzie issued a written opinion in which he concluded that Marguerite Seyse died while domiciled in the State of Connecticut. He emphasized that at the time she was taken from the hospital Ms. Seyse had no place to live in New Jersey since Ms. Oehler did not make reasonable efforts to have Ms. Seyse live with her. As one of the guardians of her mother's person at the time,
It was one of Olson's duties as a guardian of Seyse to establish a home for her after she was told she could not return to Senior quarters. Later, after she was appointed Guardian of the Person it was [one of] Olson's major responsibilities to provide Seyse with a place to live.
...
Seyse was determined to be an incompetent while she was living in New Jersey, making New Jersey the last location she intended to make her domicile. Since Seyse no longer had a place to live in New Jersey, Olson as her guardian had the ability to create a new domicile for her. It was Olson's statutory duty to provide her with a place to live.
...
Therefore, Seyse was a resident of Connecticut when she died. Since the probate proceedings have been initiated in Connecticut, Connecticut is the proper jurisdiction for the probate of Marguerite Seyse's will. See N.J.S.A. § 3B:3-28.
*698 Oehler appeals, arguing that Judge MacKenzie's determination respecting domicile and residence was erroneous and that probate jurisdiction of the estate of Marguerite Seyse properly belongs in New Jersey. She asserts the legal position that the domicile of an adult incompetent may not be changed absent satisfactory proof that the incompetent has sufficient mental capacity to choose and adopt a new domicile.
Jurisdiction over an incompetent person requires a determination of domicile. In re Estate of Gillmore, 101 N.J.Super. 77, 90, 243 A.2d 263 (App.Div.), certif. denied, 52 N.J. 175, 244 A.2d 304 (1968). Domicile is a place where a person has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning. State v. Benny, 20 N.J. 238, 251, 119 A.2d 155 (1955); Cromwell v. Neeld, 15 N.J.Super. 296, 300, 83 A.2d 337 (App.Div.1951); Santeez v. State Farm Ins. Co., 338 N.J.Super. 166, 173-74, 768 A.2d 269 (Law Div.2000); Matter of Jacobs, 315 N.J.Super. 189, 193-94, 717 A.2d 432 (Ch.Div. 1998). Domicile is to be distinguished from residence since a person may have many residences but only one true domicile. Rosenberg v. Universal Underwriters Insurance Co., 217 N.J.Super. 249, 256, 525 A.2d 349 (1986), aff'd, 224 N.J.Super. 638, 541 A.2d 246 (App.Div.), cert. denied, 113 N.J. 333, 550 A.2d 449 (1988); Kurilla v. Roth, 132 N.J.L. 213, 215, 38 A.2d 862 (Sup.Ct.1944); Jacobs, supra, 315 N.J.Super. at 193, 717 A.2d 432.
As we stated in Gillmore,
Every person has a domicile at all times, and no person has more than one domicile at any one time. [Citation omitted.] A domicle once established continues until it is superseded by a new one. Domicile may be acquired in one of three ways: (1) through birth or place of origin; (2) through choice by a person capable of choosing a domicile; and (3) through operation of law in the case of a person who lacks capacity to acquire a new domicile by choice.
[Gillmore, supra, 101 N.J.Super. at 87, 243 A.2d 263.]
Appellant argues that Ms. Seyse's domicile could not be changed once she was determined incompetent by Judge Stanton in 1994, and she cites as support In re Collins Estate, 11 N.J. Misc. 233, 165 A. 285 (Surr.Ct.1932). In that case Mary Collins, an incompetent throughout her life, lived with her parents in New York until her mother died and her father placed her in a home in New Jersey. The father paid for his daughter's board and other necessities until he died. When Mary died several years later, the question arose as to which State was to administer her estate. The Essex County Surrogate held that her domicile was that of her father and never changed throughout her life and even though her father predeceased her. See also, In re Child, 16 N.J. Eq. 498 (1864).
Collins is not binding on us, and we decline to follow it since it is based on an unacceptable principle that an incompetent is incompetent for all purposes and for all time. Developments in the study of the human mind and mental disabilities or disease have taught us that incompetency is not always immutable, and courts must be mindful not to limit the rights of an incapacitated person based on the assumption that he or she is incapacitated for all purposes. See In re M.R., 135 N.J. 155, 167, 638 A.2d 1274 (1994) (holding that an incapacitated person with developmental disabilities is presumed to have the capacity to choose where to live, and person challenging decision must prove specific incapacity by clear and convincing evidence).
*699 See also, In re Conroy, 98 N.J. 321, 382, 486 A.2d 1209 (1985).
Contrary to Collins, courts have held that a person in need of a guardian may nevertheless have the capacity to choose a domicile. M.R., supra, 135 N.J. at 164, 638 A.2d 1274; Jacobs, supra, 315 N.J.Super. at 196, 717 A.2d 432; In re Estate of Meyer, 59 Misc.2d 507, 299 N.Y.S.2d 731, 734 (Sup.Ct.1969); In re Estate of Phillips, 269 Cal.App.2d 656, 75 Cal.Rptr. 301, 307 (Ct. of App.1969); see cases collected in Annotation: Change of State or National Domicile of Mental Incompetent, 96 A.L.R.2d 1236; Restatement, Conflict of Laws 2d § 23(1).
However, courts must be wary of placing to much reliance on "glimmerings of rationality," Jacobs, 315 N.J.Super. at 200, 717 A.2d 432, in determining whether an actual intentional change of domicile has occurred especially where prospective beneficiaries of the incompetent's estate may seek an advantage. Therefore while Marguerite Seyse expressed satisfaction with her living arrangements in Connecticut to the guardian ad litem, such assurances alone are insufficient on this record for a determination as to her domicile. Cf. In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976) (holding that statements of incompetent may weigh an issue of continued treatment).
We hold that guardian may act to change the domicile of her ward. Substituted decision making is embodied in the statutory powers and duties of a guardian of a mental incompetent. N.J.S.A. 3B:12-1 to -66; Quinlan, supra, 70 N.J. at 41, 355 A.2d 647. A guardian has "all of the powers over [an incompetent person's] estate and affairs which he could exercise if present and not under a disability except the power to make a will." N.J.S.A. 3B:12-49. The guardian of the person has the authority to "establish the incapacitated person's place of abode within or without this state." N.J.S.A. 3B:12-57(a).
In this instance, Olson, then coguardian of her mother's person, took her mother from the hospital and moved her to Connecticut without authority of the court or consent of her co-guardians. However, as Judge MacKenzie found, there was no place for Ms. Seyse to live in New Jersey after release from the hospital. She could not return to Senior Quarters; and while Mr. and Mrs. Oehler could have taken her into their home, they did not do so. Accordingly, Judge MacKenzie found that Olson acted in her mother's best interest when she took her to Connecticut and within her authority as a guardian of her mother's person even though she should have sought prior approval from the court.
By subsequently appointing Olson sole guardian of her mother's person Judge MacKenzie reaffirmed Olson's decision to have her mother live in her Connecticut home. As he stated in his opinion,
When the Court appointed Olson Guardian of Seyse's person, it was aware that Olson resided in Connecticut and could not reasonably have expected Olson to move to New jersey with Seyse to satisfy statutory requirements when it could have appointed a person residing in New Jersey as Guardian of the person.
The Restatement of Conflict of Laws 2d, comment (f), states that "[n]o difficulty arises when the extent of the guardian's authority to shift the location of the incompetent's domicile may be determined from an inspection of the orders or decrees of the appointing court." In this instance, the orders of Judge MacKenzie are made clear by his own words. Olson was given permission as guardian of her mother's person to make a home for her in Connecticut where she was thereafter domiciled.
Moreover, although Olson's action in moving Seyse to Connecticut was not authorized by the court or consented to by *700 the co-guardians, Judge MacKenzie found that the change of domicile was in Ms. Seyse's best interest and not a ploy for Olson to establish a selfish purpose. While no New Jersey cases have directly addressed the issue, courts in other jurisdictions have held that the best interest of the incompetent ward is a determinative factor on the question of whether a shift of domicile to another state was within the proper authority of a guardian. See Bethesda Lutheran Homes and Servs., Inc. v. Leean, 122 F.3d 443, 449 (7th Cir.1997); Juvelis v. Snider, 68 F.3d 648, 655 (3d Cir.1995); Rishell v. Jane Phillips Episcopal Mem. Med. Ctr., 12 F.3d 171 (10th Cir.1993); McEachron v. Glans, 983 F.Supp. 330 (N.D.N.Y.1997); Last v. Elwyn, Inc., 935 F.Supp. 594 (E.D.Pa.1996); and Love v. Roosevelt Hosp., No. 92 Civ. 4211, 1993 WL 190345 (S.D.N.Y. June 2, 1993); contra, Long v. Sasser, 91 F.3d 645 (4th Cir.1996); see generally, Restatement, Conflicts of Laws § 23(f). As stated by Chief Judge Posner of the Seventh Circuit,
The idea of trundling an incompetent from state to state in search of procedural advantages is distasteful. To deny the guardian all power to change the ward's residence to the state in which the best treatment is available might seem equally distasteful.
[Bethesda Lutheran Homes, supra, 122 F.3d at 449.]
We conclude that Judge MacKenzie properly considered the issue of the best interest of Marguerite Seyse in determining that her change of domicile was within the proper authority of Olson as guardian of her person and that probate jurisdiction was properly transferred to the State of Connecticut.
Affirmed.
NOTES
[1] Judge Parker did not participate in oral argument. However, the parties consented to her participation in the decision subsequent to argument.