871 A.2d 767

IN THE MATTER OF THE GUARDIANSHIP
OF WALTER J. MACAK.

Superior Court of New Jersey
Appellate Division

Argued March 15, 2005—Decided April 27, 2005.

168

170

Before Judges STERN, S.L. REISNER and GRAVES.

*Lee B. Roth* argued the cause for appellant Walter J. Macak (*Lee B. Roth and Associates,* attorneys; *Erica Edwards,* on the brief).

*John W. Thatcher* argued the cause for respondent LaDonna L. Burton (*Thatcher & Lanza,* attorneys; *Mr. Thatcher,* on the brief).

The opinion of the court was delivered by

S.L. REISNER, J.A.D.

Walter J. Macak appeals from an order of the trial court granting summary judgment. The trial court dismissed a 2003 application in which Mr. Macak asked the court to set aside a 2002

judgment declaring him incapacitated and to restore him to legal capacity, pursuant to *R.* 4:86–7. We reverse and remand for a plenary hearing.

I

In 2002, Mr. Macak's daughter filed a complaint pursuant to *R.* 4:86–2, seeking the appointment of a guardian for her father based on her contention that he was incapacitated. The complaint was supported by affidavits from two doctors. The impetus for the complaint was her concern that Mr. Macak had Alzheimer's disease, was unable to manage his finances, and was falling prey to financial "scam artists." Further, he was living alone in a large house cluttered with debris. Mr. Macak directed his attorney to oppose the guardianship application and specifically indicated his opposition to having his daughter appointed as his guardian, if he was declared incapacitated.

Instead of opposing the guardianship or advocating for Mr. Macak's choice of guardian, his attorney negotiated a "settlement" under which she signed a consent order on Mr. Macak's behalf. The consent order, which the trial court signed without holding a hearing or making findings of fact and conclusions of law, declared Mr. Macak to be incapacitated and appointed an attorney, LaDonna Burton, as his guardian. Ms. Burton was to serve without bond, although, at the time, Mr. Macak's estate was worth approximately one million dollars. The consent order also provided that the guardian would continue Mr. Macak's "gifting program" of giving his daughter $18,000 per year. Mr. Macak also signed a separate written agreement with Ms. Burton, in which he agreed to move out of his house into an assisted living facility within five days of the date of the agreement and she agreed to permit him to visit his house on a regular basis.

On this appeal, the parties stipulated that Mr. Macak entered into the 2002 agreement because his attorney and Ms. Burton convinced him that if he were declared incapacitated, absent the

agreement, the court would appoint his daughter as his guardian against his wishes.

In 2003, Mr. Macak persuaded a friend to help him retain an attorney to assist him in re-opening the guardianship. Mr. Macak's attorney filed a complaint contending that Ms. Burton had prevented Mr. Macak from visiting his house, that he had signed the guardianship "agreement" under duress, and that he was not incapacitated but only needed assistance in managing his finances. He therefore asked the court to set aside the guardianship, restore him to legal capacity, and appoint a conservator for him.

Following some limited discovery, both sides filed reports from doctors who had examined Mr. Macak, and reports from a geriatric specialist concerning whether he could resume living in his house. Mr. Macak's doctor, Dr. Paul Rosenberg, opined that he suffered from mild dementia, but was not incapacitated. The doctor retained by the guardian, as well as the court-appointed doctor, disagreed with Dr. Rosenberg. Anthony J. Serra, Esq., a guardian ad litem appointed by the court, issued a fifty page report cogently detailing the errors in the prior guardianship proceeding and advocating that the court consider allowing Mr. Macak to resume living in his house.

The court declined to hold an evidentiary hearing. Instead, the court granted the guardian's motion for summary judgment, concluding that Dr. Rosenberg's opinion was in the "vast minority."

## II

After reviewing the record, including all of the medical reports and the report of the guardian ad litem, we conclude that the initial guardianship proceeding in 2002 was fraught with error, mandating that the matter be remanded for a hearing on the issue of Mr. Macak's capacity. We are also persuaded that the existence of material disputes of fact entitled Mr. Macak to an evidentiary hearing on his 2003 application to re-open the guardianship. Therefore, we remand this matter to the trial court for a hearing on the following issues: whether Mr. Macak is incapacitat-

ed such that he requires a guardian; if so, whether the guardianship should be plenary or whether Mr. Macak retains the ability to make certain decisions for himself such that the guardianship should be limited in certain aspects; if Mr. Macak is incapacitated, whether the guardian should continue to be authorized to make gifts to his daughter. If Mr. Macak is not incapacitated, the court on remand should adjudicate his application for the appointment of a conservator.[1]

▇▇▇ An incapacitated person cannot enter into a consent order declaring him to be incapacitated nor can he consent to the appointment of a plenary guardian. An incapacitated person by definition "is unfit and unable to govern himself or herself and to manage his or her affairs," R. 4:86–2(b)(6), and hence cannot "settle" a guardianship action in such a fashion. See N.J.S.A. 3B:1–2.[2] The obvious contradictions inherent in such a procedure are discussed properly and at length in the cogent report of the guardian ad litem. Further, as this case illustrates, the potential for overreaching and undue influence is unacceptably high. Even if the parties agree that the court can consider the reports of the examining doctors without requiring their testimony, R. 4:86–6(a), and even if the alleged incapacitated person chooses not to testify, the court must still independently consider all of the evidence, including the doctors' reports and the report of the court appoint-

---

[1] We will not, at this time, disturb the order appointing LaDonna Burton as Mr. Macak's guardian, because the record evidence would support appointment of a guardian on an interim basis, at least to safeguard Mr. Macak's assets, pending an evidentiary hearing on an application for permanent guardianship. See N.J.S.A. 3B:12–1 to –4; cf. In re Farnkopf, 363 N.J.Super. 382, 391–94, 833 A.2d 89 (App.Div.2003).

[2] Where the person is not incapacitated, but he has sufficient mental or physical impairment that he requires assistance in managing his finances, he may ask the court to appoint a conservator. See In re Conservatorship of Halley, 342 N.J.Super. 457, 461–63, 777 A.2d 68 (App.Div.2001). This choice, to which he can agree because he has capacity, does not result in the loss of his civil liberties, and he can later petition the court to remove the conservator. See N.J.S.A. 3B:13A–1 to –36.

ed attorney, and must make findings by clear and convincing evidence as to whether the person is incapacitated. *R.* 4:86–6. *See In re M.R.,* 135 *N.J.* 155, 169, 638 *A.*2d 1274 (1994); *N.J.S.A.* 52:27G–29a; *Farnkopf, supra,* 363 *N.J.Super.* at 390, 833 *A.*2d 89.

If the court finds that the person is incapacitated, the court must then independently determine whom to appoint as guardian. In making this determination, the court should consider the recommendations of the court-appointed attorney and the wishes of the incapacitated person, if expressed. A person who is incapacitated may nonetheless still be able to express an intelligent view as to his choice of guardian, which view is entitled to consideration by the court. *M.R., supra,* 135 *N.J.* at 176, 638 *A.*2d 1274. It is the duty of the court appointed attorney to advocate for the client's choice of guardian as well as to advocate the client's position with respect to the underlying issue of whether the client is incapacitated. *Ibid.* If there is a significant issue as to the appropriate choice of guardian, or as to the underlying issue of incapacity, the court may appoint a guardian ad litem to advise the court as to the person's best interests. *Id.* at 176–78, 638 *A.*2d 1274; *R.* 4:86–4(d).[3] Under no circumstances should a person in Mr. Macak's situation be coerced into agreeing to a guardianship under the threat that, if he does not do so, the court will appoint a particular person as guardian whom he does not want to serve as his guardian.

Ordinarily, once a person is declared incapacitated, the appointed guardian decides where the person will live as part of deciding what is in the ward's best interest. *In re Seyse,* 353 *N.J.Super.* 580, 588, 803 *A.*2d 694 (App.Div.), *certif. denied,* 175

---

[3] As discussed at length in *M.R., supra,* 135 *N.J.* at 172–78, 638 *A.*2d 1274, the court-appointed attorney for the incapacitated person and the guardian ad litem have different roles. In a guardianship action, *Rule* 4:86–4(b) requires the court to appoint an attorney to serve as an independent legal advocate for the alleged incapacitated person. On the other hand, in the court's discretion, in "special circumstances," *Rule* 4:86–4(d) authorizes appointment of a guardian ad litem to advise the court concerning the best interests of the incapacitated person.

*N.J.* 80, 812 *A.*2d 1112 (2002). However, a person who is incapacitated in some respects may nonetheless have sufficient capacity to make a choice as to where he wishes to live, and if he does, the guardianship should be limited to allow him to make the choice. *M.R., supra,* 135 *N.J.* at 169, 638 *A.*2d 1274; *Seyse, supra,* 353 *N.J.Super.* at 587–88, 803 *A.*2d 694. His attorney has an obligation to advocate the client's preferences if the client is able to express them. *M.R., supra,* 135 *N.J.* at 175–78, 638 *A.*2d 1274.

In determining whether the person in fact has the capacity to choose where he will live, the court must differentiate between "glimmerings of rationality," and the medically-documented ability to make a rational choice on the issue. *Seyse, supra,* 353 *N.J.Super.* at 588, 803 *A.*2d 694 (quoting *In re Jacobs,* 315 *N.J.Super.* 189, 197, 717 *A.*2d 432 (Ch.Div.1998)). The ability to express a preference is not necessarily the same as the ability to make a rational choice. Where the choice of residence presents safety risks, for example, the court must consider whether the person can recognize and appreciate the potential risks presented by the choice, and whether he can and will take reasonable steps to mitigate those risks. *See M.R., supra,* 135 *N.J.* at 169, 638 *A.*2d 1274 (court must consider the seriousness of the decision in weighing capacity). For example, a person who does not have the capacity to live alone in his own house might recognize the attendant risks and be willing to accept twenty-four hour a day, live-in assistance. *Compare In re Schiller,* 148 *N.J.Super.* 168, 180–81, 372 *A.*2d 360 (Ch.Div.1977) (capacity to make medical decisions includes the ability to appreciate the risks and benefits of accepting or refusing medical treatment).

In this case, Mr. Macak has consistently expressed a strong preference to live in his own house. Of course, if Mr. Macak is not incapacitated, he has a right to choose to live at home, even if that seems to his family and friends to be an impractical or risky choice. *M.R., supra,* 135 *N.J.* at 167, 638 *A.*2d 1274. We intimate no view as to whether living in his home is a viable choice if he is incapacitated. However, if he has sufficient remaining mental

capacity to make this choice, and if he has sufficient financial resources to make necessary repairs to the house and to pay for appropriate in-home care, he should not be denied the choice if it can practicably be granted to him. The court must also consider whether, given the state of Mr. Macak's physical and mental health, living at his house is a viable choice, apart from the financial issues.[4]

 The court must also address the issue of gifts to Mr. Macak's daughter. The guardian may apply to the court for permission to make such gifts "as the ward might have been expected to make." *N.J.S.A.* 3B:12–58. However, in approving such an application, the court must find that it is in the ward's best interest to make the gifts, *N.J.S.A.* 3B:12–50, and must consider the factors set forth in *In re Trott,* 118 *N.J.Super.* 436, 440, 288 *A.*2d 303 (Ch.Div.1972), as adopted by the Supreme Court in *In re Keri,* 181 *N.J.* 50, 63, 853 *A.*2d 909 (2004). Those factors are as follows:

> (1) the mental and physical condition of the incompetent are such that the possibility of her restoration to competency is virtually nonexistent; (2) the assets of the estate of the incompetent remaining after the consummation of the proposed gifts are such that, in the light of her life expectancy and her present condition of health, they are more than adequate to meet all of her needs in the style and comfort in which she now is (and since the onset of her incompetency has been) maintained, giving due consideration to all normal contingencies; (3) the donees constitute the natural objects of the bounty of the incompetent by any standard . . . ; (4) the transfer will benefit and advantage the estate of the incompetent by a reduction of death taxes; (5) there is no substantial evidence that the incompetent, as a reasonably prudent person, would, if competent, not make the gifts proposed in order to effectuate a saving of death taxes.
>
> [*Keri, supra,* 181 *N.J.* at 59, 853 *A.*2d 909 (quoting *Trott, supra,* 118 *N.J.Super.* at 442–43, 288 *A.*2d 303).]

 These procedures, essential for the ward's protection, were completely abrogated in this case. Instead, the court merely

---

[4] We imply no criticism of Ms. Burton, who apparently was not willing to serve as guardian unless Mr. Macak moved to an assisted living facility. However, if the housing issue is contested on remand, the court's determination cannot turn on whether Ms. Burton is willing to serve as guardian if Mr. Macak resumes living in his house.

accepted a "settlement" in which the allegedly incapacitated person agreed to be declared incapacitated, agreed to the appointment of a guardian, and agreed that the guardian could continue to make substantial monetary gifts to his daughter. No hearing was held. The court did not make the required findings, by clear and convincing evidence, concerning whether or not Mr. Macak is incapacitated. The court further failed to make the findings, required by *Trott* and *Keri*, necessary to authorize the guardian to make gifts of Mr. Macak's money to his daughter. This omission was particularly troubling, because Mr. Macak's daughter was also the plaintiff in the guardianship action.[5] Moreover, counsel for the guardian readily concedes that Mr. Macak agreed to this "settlement" in order to avoid the likelihood that, should he insist on a hearing and be declared incapacitated, his daughter would be appointed his guardian.

■ A person who is not incapacitated may nonetheless be subject to undue influence. *Haynes v. First Nat'l State Bank of N.J.*, 87 *N.J.* 163, 185, 432 *A.*2d 890 (1981). Whether or not Mr. Macak was incapacitated at the time of the settlement, the entire scenario presents the possibility of overreaching and undue influence. Even if all concerned had only his best interests at heart, his legal interests were not properly protected.

■ In addition, for reasons not explained on this record, Ms. Burton was permitted to serve without bond; hence, in this respect also, Mr. Macak's financial interests were not safeguarded. Mr. Macak has assets of over one million dollars. In view of the size of his estate, the court should require an individual appointed as his permanent guardian to post bond. *See N.J.S.A.* 3B:15–1(d). If there are extraordinary reasons justifying the waiver of a bond,

---

[5] While it is permissible for a child-beneficiary to propose gifting from the parent's assets, it is critically important for the court to obtain independent recommendations from appointed counsel for the incapacitated person, *R.* 4:86–4(b), and from the guardian ad litem, if one has been appointed, *R.* 4:86–4(d). *See Keri, supra*, 181 *N.J.* at 66–68, 853 *A.*2d 909.

that determination should be set forth in a decision supported by appropriate factual findings.

We also agree with Mr. Macak that he was entitled to an evidentiary hearing on his 2003 application to re-open and set aside the guardianship and to appoint a conservator. The Court Rules require a testimonial hearing on an application to restore a person to legal capacity. *R.* 4:86–7 ("the court shall . . . take oral testimony in open court"); *In re D.K.*, 204 *N.J.Super.* 205, 227, 497 *A.*2d 1298 (Ch.Div.1985). Even if there had been no deficiencies in the original 2002 guardianship proceedings, Mr. Macak was entitled to a hearing on his 2003 application, because the proofs presented on that application created a material dispute of fact as to his capacity. Ms. Burton contends, in essence, that a hearing would be an expensive waste of time, and she implies that Mr. Macak's current attorneys are taking advantage of him. In support of her motion for summary judgment, she presented what may prove at hearing to be entirely convincing evidence of Mr. Macak's incapacity. On the other hand, Mr. Macak presented a report from Dr. Paul Rosenberg that contradicted the evidence submitted by Ms. Burton. In light of the conflicting evidence, the court should have held a hearing. The fact that, as the trial court stated, Dr. Rosenberg's opinion was in the "vast minority" did not defeat Mr. Macak's right to a hearing. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). Consequently, we reverse the grant of summary judgment and remand this matter to the trial court for a hearing.

Nothing in our opinion today would prevent the trial court from structuring the required hearing so as to avoid cumulative testimony. It may be that the most helpful evidence would be the testimony of Mr. Macak himself, and the trial court might require that, if Mr. Macak intends to testify, he should do so before the expert witnesses appear. Thereafter, in consultation with the court and their clients, counsel might determine which experts will testify and whether, as to some of them, their reports may be submitted in lieu of their testimony. *R.* 4:86–6(a).

In addition to determining whether Mr. Macak is incapacitated, the trial court should determine whether, despite his incapacity, he retains the ability to make some decisions for himself and, therefore, whether the guardianship should be limited in any way. *See M.R., supra,* 135 *N.J.* at 169, 638 *A.*2d 1274; *R.* 4:86–4(b) (court-appointed counsel must report as to "a delineation of those areas of decision-making that the alleged mentally incapacitated person may be capable of exercising"). It may be that some or all of the terms included in the "settlement" of the initial guardianship action would be appropriate for inclusion in a court order of limited guardianship. In light of *Keri* and *Trott,* if Mr. Macak is incapacitated, the court must also determine whether to approve any continued gifting of Mr. Macak's assets to his daughter. If the court concludes that Mr. Macak is not incapacitated, the court should then adjudicate his application for the appointment of a conservator. In light of the issues presented, the guardian ad litem should participate in the proceedings on remand. *R.* 4:86–4(d).

At the conclusion of the proceedings, the trial court will decide the fee applications of all counsel who seek to be paid from Mr. Macak's assets pursuant to *R.* 4:86–4(e). The trial court should closely scrutinize all fee applications to ensure that Mr. Macak pays only for time reasonably spent in light of the value to Mr. Macak of the services rendered, at a reasonable hourly rate. The fact that Mr. Macak is relatively affluent does not justify any excessive or duplicative billing.[6]

Finally, we comment briefly on Mr. Macak's contention that the guardian improperly denied him funds to retain counsel and experts to litigate this matter. We recognize the balance between

---

[6] The fee applications already granted by the trial court are not directly the subject of this appeal, but we confess some puzzlement at how a matter such as this, which apparently involved only limited discovery and no trial, could have occasioned over $50,000 in billings by Mr. Macak's attorneys. We also note that the briefs filed on this appeal were minimal, perhaps to conserve Mr. Macak's assets, and would not justify more than a modest fee.

the guardian's obligation, once appointed, to act in the ward's best interests and to prevent others from exploiting him, and the ward's fundamental interest in restoring his civil liberties. Should such a situation arise in future, where there is a conflict between the ward's apparent desire to retain counsel and the guardian's reluctance to fund the representation, the guardian should petition the court for direction. Such an application may request that the court initially interview the ward or that the court appoint a temporary guardian ad litem to interview the ward and make a recommendation as to whether there appears to be at least a prima facie basis to set aside or modify the guardianship. *See In re Conservatorship of Halley*, 342 *N.J.Super.* 457, 461–63, 777 *A.*2d 68 (App.Div.2001).

## III

The hearing on remand shall be held and decided within forty-five days after the date of this opinion. Should there be disagreements over the need to have any of the experts re-examine Mr. Macak prior to the hearing on remand, those issues should be expeditiously submitted to the trial judge. We do not retain jurisdiction.

Reversed and remanded.