**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0847-24

IN THE MATTER OF F.M.W.,[1]
An Alleged Incapacitated Person.
_____

> APPROVED FOR PUBLICATION
> **February 20, 2026**
> APPELLATE DIVISION

Submitted October 21, 2025 – Decided February 20, 2026

Before Judges Sumners, Chase, and Augostini.

On appeal from the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. P-287582-24.

Lanza Law Firm, LLP, attorneys for appellant (Kenneth W. Thomas, of counsel and on the briefs).

Hoyle Law LLC, attorneys for respondent (John G. Hoyle, III, of counsel and on the brief).

The opinion of the court was delivered by

AUGOSTINI, J.A.D.

The matter before us addresses the legal process in determining the responsibility of making life decisions on behalf of an incapacitated person. The parties do not dispute that F.M.W. was incapacitated and in need of a guardian.

---

[1] The parties are identified by initials to protect the confidentiality of the court's guardianship records. R. 1:38-3(e).

She lived with her sister, R.W., her only relative. R.W. appeals from the probate court's October 10, 2024 order appointing the New Jersey Office of the Public Guardian of Elderly Adults (Public Guardian), and not R.W., as her sister's guardian.

We conclude that R.W. was not afforded due process — the opportunity to call witnesses and conduct cross-examination — and the probate court did not make findings of facts and conclusions of law as required by our court rules. However, before R.W.'s appeal was decided, F.M.W. died on July 29, 2025; thus, R.W.'s appeal "technically became moot." M.R. v. N.J. Dep't of Corr., 261 N.J. 322, 335 n.7 (2025). Nevertheless, because the procedural issues raised in this appeal are significant and "'capable of repetition, yet evading review,'" ibid. (quoting Mistrick v. Div. of Med. Assistance & Health Servs., 154 N.J. 158, 165 (1998)), this appeal is "justiciable despite [F.M.W.'s] passing," ibid. (quoting State v. Cassidy, 235 N.J. 482, 491 (2018)). Had we been afforded the opportunity to decide this appeal prior to F.M.W.'s passing, we would have remanded the matter to the probate court to conduct an evidentiary hearing to allow the parties to call witnesses and conduct cross-examination and to issue findings of facts and conclusions of law.

A-0847-24

I.

We glean the following facts from the record. F.M.W. lived with R.W., who served as her caregiver. In late 2023, Adult Protective Services of Monmouth and Middlesex Counties (Protective Services) received an anonymous referral reporting concerns of neglect of F.M.W. Protective Services alleged that R.W. was removing F.M.W. from a facility without setting up the necessary services for her at home. The agency further alleged R.W. "has her own mental health issues and is unable to provide adequate care" for her sister.

In September 2023, Protective Services social worker, Sabrina Dougherty, visited F.M.W. at her home for an initial assessment. R.W. was present for the home visit but allegedly was uncooperative and refused to provide any of F.M.W.'s medical information to Dougherty. R.W. claimed to have power of attorney (POA) for F.M.W., although she did not produce it.

Dougherty visited the home multiple times between September 2023 and May 2024. At times, R.W. allegedly would not allow Dougherty to see F.M.W. Dougherty contacted F.M.W.'s physician's office and learned that F.M.W. had missed or canceled several medical appointments. The physician's office reported that attempts were made to reach R.W., who had been unresponsive.

A-0847-24

Protective Services further alleged that F.M.W. lost her home health aide in April 2024 due to R.W.'s actions.

F.M.W.'s former aide, Nancy Desrosiers, alleged that R.W. did not take proper care of F.M.W. For instance, Desrosiers reported that R.W. left F.M.W. in the same clothes as the day before, and that the clothes would be soiled with urine. In Desrosiers' report, she noted there was "always a profound odor that permeates around where [F.M.W.] sits[,]" and that F.M.W. was "usually found in the fetal position." The report also contained positive findings; for example, R.W. would usually prepare breakfast for F.M.W., and "[t]he house [would] usually [be] clean."

Based on its involvement with F.M.W., Protective Services determined that F.M.W. should undergo capacity evaluations "to determine her ability to care for herself and manage her affairs." John Burger, D.O., and Douglas Ballan, M.D., evaluated F.M.W. Dr. Burger diagnosed F.M.W. with advanced Alzheimer's dementia, while Dr. Ballan concluded she has "severe cognitive impairment likely due to Alzheimer's type dementia." Both physicians opined that F.M.W. was an incapacitated person who was unfit and unable to govern

4

herself, her affairs, and needed a plenary guardian. The doctors concluded that F.M.W.'s prognosis for recovery was poor.

On June 11, 2024, Protective Services filed a verified complaint for appointment of a permanent guardian for F.M.W., attaching certifications by Drs. Burger and Ballan in support of the requested relief. Protective Services recommended the Public Guardian as permanent guardian for F.M.W.

On July 5, 2024, the court scheduled the matter for a hearing and appointed William Saxton, Esq., as F.M.W.'s attorney. After meeting with F.M.W. in her home on August 19, 2024, Saxton completed a report and addendum in compliance with Rule 4:86-4(b). According to Saxton, R.W. delayed and rescheduled this meeting multiple times, resulting in Saxton filing a request with the court for an order permitting him access to F.M.W.

Once Saxton was able to meet with F.M.W., he found her to be severely underweight "to the point [where he] . . . described [her] as emaciated or gaunt." According to Saxton, R.W. advised him that F.M.W. had not seen a medical professional in nearly a year. Concerned about F.M.W.'s well-being, emergency medical personnel were called to the house to check her vitals, which were within normal limits. Saxton reported that, although F.M.W. was dressed properly and had good hygiene, he found it suspicious that F.M.W. was always

5

in the shower or freshly showered before a home visit from him or a social worker.

Saxton noted that his report was "compiled from interviews with many people[;]" however, "[a] number of those people spoke [with Saxton] on the condition of anonymity." In his report, Saxton summarized his interviews with: Desrosiers, who left or was forced to leave F.M.W.'s care; Claudette Forbes, who owns and manages Homewatch CareGivers of Woodbridge—Desrosiers' employer; and Kim Todd, F.M.W.'s long-time friend. Although he received contact information for F.M.W.'s medical providers, Saxton's report did not contain interviews with any of these professionals.

Saxton stated that Forbes advised him that R.W. "struggles with extreme depression" and "is in no shape" to be responsible for F.M.W. Forbes further relayed that she visited the home and had seen F.M.W. "sitting like a zombie on the floor, rolled up in a ball, rocking back and forth, like in a comatose state." Forbes also allegedly stated that she or her employees have "forcefully intervened to make doctors['] appointments" and that R.W. cancels these appointments. Forbes also told Saxton that R.W. suffers from paranoia and said

A-0847-24

that R.W. "has been heard" having contacted the FBI and covered up the television, ornaments, and windows in the home due to fear of being watched.

Todd opined that R.W. does not properly care for F.M.W. For instance, Todd could not confirm whether F.M.W. takes her medications and allegedly believes that R.W. fails to take F.M.W. to medical appointments. Todd allegedly told Saxton that R.W. does not cook for F.M.W., unjustly fired her former aide, kicked Todd out of the home when she questioned R.W.'s actions, and R.W. almost never leaves the house. Todd further corroborated the notion that R.W. suffers from paranoia, has contacted the FBI and believes she is being watched.

Saxton observed F.M.W.'s home and noted that the downstairs was "very cluttered" although F.M.W.'s bedroom was "clean and tidy." Saxton described the home as dark and claimed that R.W. became aggressive with him and the social worker during the visits. R.W. allegedly defended not taking F.M.W. to medical appointments by asserting that there is no reason to because F.M.W. does not have any medical conditions.

Saxton states that although he cannot fully discern F.M.W. and R.W.'s financial situation, he surmised that F.M.W. took care of R.W. financially prior to F.M.W.'s cognitive decline. Saxton further alleged that defendant may be

7

siphoning funds from F.M.W.'s accounts to support herself and hire legal representation in the present matter.

In conclusion, Saxton "strongly opposed" R.W.'s appointment as F.M.W.'s guardian. Saxton believed that R.W. "shows signs of deep instability, and that [R.W.'s] neglect has hastened the compromise of the physical health and well-being of [F.M.W.]."

On September 13, 2024, the probate court conducted a telephonic hearing. The court heard from Protective Services, R.W.'s attorney and Saxton, and reviewed Saxton's report and the physicians' certifications. The court noted that incapacity was not contested; the only contested issue was "who would be the most appropriate guardian."

After stating the law's preference for a family member, the probate court ruled:

> [B]ut based on . . . the reports that were presented to the [c]ourt by Mr. Saxton, the [c]ourt cannot find that [R.W.] would be an appropriate . . . guardian for purposes of . . . [F.M.W.'s] [] protection and care the [c]ourt is . . . going to appoint the . . . public guardian.
>
> So, . . . that's the [c]ourt's decision so we'll get you . . . a signed order and that will conclude our hearing.

On October 10, 2024, the court issued a conforming order appointing the Public Guardian as the guardian of F.M.W.'s person and estate.

A-0847-24

On appeal, R.W. raises one argument for our consideration:

> THE LOWER COURT ERRED IN APPOINTING THE [PUBLIC GUARDIAN] AS GUARDIAN FOR [F.M.W.] WITHOUT TAKING WITNESS TESTIMONY FROM ANYONE OTHER THAN WILLIAM SAXTON, ESQ.[,] OR MAKING FINDINGS OF FACT AS TO [F.M.W.'S] BEST INTERESTS.

## II.

Our analysis begins with the recognition that individuals have the right

> to determine their unique destiny through the decisions they make—to govern and manage their own affairs— is an implicit guarantee of the New Jersey Constitution, which provides that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."
>
> [S.T. v. 1515 Broad Street, LLC, 241 N.J. 257, 274-75 (2020) (alteration in original) (quoting N.J. Const. art. I, ¶ 1; and citing In re M.R., 135 N.J. 155, 166 (1994))].

We review a determination made by a probate court on the issue of guardianship for an abuse of discretion. See In re Est. of Hope, 390 N.J. Super. 533, 541 (App. Div. 2007). "The exercise of [] discretion will be interfered with by an appellate tribunal only when the action of the trial court constitutes a clear abuse of that discretion." Salitan v. Magnus, 28 N.J. 20, 26 (1958). An abuse

9

of discretion occurs where "the 'decision [was] made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" United States v. Scurry, 193 N.J. 492, 504 (2008) (alteration in original) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

When a party does not object to an alleged trial error or otherwise properly preserve the issue for appeal, the appellate court may nonetheless consider it if it meets the plain error standard of Rule 2:10-2. State v. Clark, 251 N.J. 266, 286-87 (2022); State v. Singh, 245 N.J. 1, 13 (2021); State v. Gore, 205 N.J. 363, 383 (2011). The plain error standard requires a determination of: "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' [Rule] 2:10-2; that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Dunbrack, 245 N.J. 531, 544 (2021) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)).

A guardianship action of "an alleged incapacitated individual and the proceedings required for a judgment of incapacity are governed by court rule and statute." S.T., 241 N.J. at 280 (citing R. 4:86-1 to -8; N.J.S.A. 3B:12-24 to -35). Our "rigorous procedural safeguards" exist to "protect the subject" of the

10

proceeding "because a finding of incapacity results in an individual's loss of the right of self-determination." Id. at 280-81. The probate court's parens patriae authority to appoint a guardian is "deriv[ed] from the inherent equitable authority of the sovereign to protect persons within the state who cannot protect themselves because of an innate disability." In re Grady, 85 N.J. 235, 259 (1981) (citation omitted).

A court tasked with such a significant decision must engage in a two-step analysis: first, the court must determine by clear and convincing evidence if the individual is incapacitated; second, upon making a finding of incapacity, the court must determine whether to appoint a general or limited guardian and must appoint an individual to serve in that capacity. S.T., 241 N.J. at 281; R. 4:86-6(c).

A guardianship action begins with the filing of a verified complaint, accompanied by either affidavits or certifications from two physicians, or one physician and one licensed practicing psychologist, who examined the alleged incapacitated person and opined on whether the person can govern themselves and their affairs. R. 4:86-2. The affidavit or certification should include:

> (A) the date and place of the examination;
>
> (B) whether the affiant has treated or merely examined the alleged incapacitated individual;

(C) whether the affiant is disqualified under [Rule] 4:86-3;

(D) the diagnosis and prognosis and factual basis therefor;

(E) for purposes of ensuring that the alleged incapacitated person is the same individual who was examined, a physical description of the person examined, including but not limited to sex, age and weight;

(F) the affiant's opinion of the extent to which the alleged incapacitated person is unfit and unable to govern himself or herself and to manage his or her affairs and shall set forth with particularity the circumstances and conduct of the alleged incapacitated person upon which this opinion is based, including a history of the alleged incapacitated person's condition;

(G) if applicable, the extent to which the alleged incapacitated person retains sufficient capacity to retain the right to manage specific areas, such as residential, educational, medical, legal, vocational or financial decisions; and

(H) an opinion on whether the alleged incapacitated person is capable of attending or otherwise participating in the hearing and, if not, the reasons for the individual's inability[.]

[R. 4:86-2(b)(2).]

If the alleged incapacitated person is committed to an institution, the Rule also provides that one of the affidavits may be submitted by the chief executive officer, medical director, or chief of service from the institution. Ibid.

Once satisfied with the "sufficiency of the complaint," the court schedules a hearing upon twenty days' notice to the alleged incapacitated person and their attorney, individuals named by that person in a POA or health care directive, the person's spouse or children, and any other persons as the court directs. R. 4:86-4(a)(2). "The order for hearing shall require that any proposed guardian comply with any applicable background screening policy for proposed guardians of incapacitated adults as promulgated by the Administrative Director of the Courts, including but not limited to fingerprinting." R. 4:86-4(a)(7).

Unless counsel represents the alleged incapacitated person, the court must appoint counsel. Ibid.; see also ST., 241 N.J. at 281. Counsel is required to: (1) "personally interview the alleged incapacitated person;" (2) interview persons familiar with their circumstances, "his or her physical and mental state[,] and property;" and (3) locate and investigate any "will, powers of attorney, or health care directives previously executed by the person or discover any interests they may have as a beneficiary or of a will or trust." R. 4:86-4(b).

13

On the issue of incapacity, "the alleged incapacitated person or someone on his [or her] behalf," may request a trial by jury. N.J.S.A. 3B:12-24; see also S.T., 241 N.J. at 281. Otherwise, "the court must take 'testimony in open court' and 'determine the issue of incapacity.'" S.T., 241 N.J. at 281 (citing R. 4:86-6(a)). If the court determines whether a "general or limited guardian of the person or of the estate or of both," is needed, the court must then appoint a guardian in accordance with the preferences established by court rule and statute. R. 4:86-6(c); see also N.J.S.A 3B:12-24.

Rule 1:7-4(a) requires:

> [t]he court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury, on every motion decided by a written order that is appealable as of right . . . .

To satisfy this requirement, a trial court must "state clearly its factual findings and correlate them with the relevant legal conclusions." Curtis v. Finneran, 83 N.J. 563, 570 (1980) (citations omitted).

III.

Applying the above legal principles to the matter before us, we conclude that the probate court misapplied its discretion by not comporting with the requirements of Rule 4:86-4 and Rule 1:7-4 in the following ways. First, the

14

court failed to make adequate findings by clear and convincing evidence as to whether F.M.W. was incapacitated and in need of a guardian. After finding incapacity, the court misapplied its discretion by not conducting a hearing in open court, taking testimony, permitting cross-examination on the contested issue of who should be appointed as F.M.W.'s guardian, and not making detailed findings of fact and conclusions of law on this issue. We hold that certain due process procedural safeguards established by the applicable statutes and court rules—namely, the right to limited discovery and a hearing in open court with testimony and cross-examination—apply to the determination of the appointment of a guardian.

## A.

The initial procedural steps of filing a complaint, accompanied by two physician certifications, appointing an attorney for F.M.W., and scheduling a hearing all took place in this case. At its only hearing, the court noted F.M.W.'s incapacity was not contested, and then merely summarized Dr. Burger and Dr. Ballan's conclusions that she could not care for herself. The court offered no analysis of the proofs in this case in the context of F.M.W.'s best interests and made no findings—let alone by clear and convincing evidence—as to F.M.W.'s incapacity. The lack of dispute regarding F.M.W.'s incapacity did not obviate

15

the need for the court to consider all the evidence and "make findings by clear and convincing evidence as to whether [F.M.W.] was incapacitated." In re Guardianship of Macak, 377 N.J. Super. 167, 176 (App. Div. 2005) (citing R. 4:86-6) (citations omitted).

## B.

Once the court determined F.M.W. was incapacitated, it was obligated to determine whether a limited or full guardian was required of the person or of the estate or both. R. 4:86-6(c). "[A] person who is incapacitated in some respects may nonetheless have sufficient capacity to make a choice as to where he or she wishes to live, and if he or she does, the guardianship should be limited to allow him [or her] to make the choice." Macak, 377 N.J. Super. at 177 (citing In re M.R., 135 N.J. at 169). The court made no findings on this issue.

The primary dispute in this case centered on whom the court should appoint as F.M.W.'s guardian: her sister, R.W., or the state agency, the Public Guardian. Our Legislature has prioritized those individuals to be considered as the surrogate decision-maker for an incapacitated person: first, the person's spouse or domestic partner; next, their heirs or friends; and lastly, the Public Guardian. N.J.S.A. 3B:12-25. This "next-of-kin" preference "must be recognized unless it is shown to the court's satisfaction that the appointment of

16

next-of-kin would be affirmatively contrary to the best interests of the [incapacitated person] or his [or her] estate . . . in some significant way." In re Roll, 117 N.J. Super. 122, 124 (App. Div. 1971). The court may also consider a "surrogate decision-maker[], . . . chosen by the incapacitated person before they became incapacitated by way of a durable power of attorney . . . health care proxy or advance directive." N.J.S.A. 3B:12-25; see also R. 4:86-4(a)(2).

In 2014—before F.M.W. became incapacitated—she created a durable POA, appointing R.W. as her agent over her affairs. In its decision, however, the court made no mention of this POA and F.M.W.'s expressed wishes. Although the court was free to give whatever weight it deemed appropriate to this document, it erred in not considering it in its analysis.

At the September 13, 2024 telephonic hearing, the court heard argument on Protective Services' application from counsel for Protective Services, R.W., and F.M.W. Counsel for Protective Services and Saxton argued for the appointment of the Public Guardian; while R.W., disputing the claims raised by Protective Services and Saxton about her, urged the court to appoint her as F.M.W.'s guardian. In addition to considering counsels' arguments, the court reviewed Saxton's report and the two doctors' medical certifications and

addendums before deeming F.M.W. incapacitated, finding R.W. not an appropriate guardian, and appointing the Public Guardian.

R.W. did not request discovery, a jury trial, or a plenary hearing on the issue of who should be appointed F.M.W.'s guardian. Nonetheless, R.W., in her answer to Protective Services' complaint, denied many of the challenges to the care she provided her sister. The record also contained positive observations contradicting the concerns raised by Protective Services and Saxton. For example, during his home visit in May 2024, Dr. Burger observed F.M.W. to be "well-groomed" and "well-nourished" although she had "been rapidly declining over the past few months." Likewise, during his May 2024 home visit with F.M.W., Dr. Ballan noted F.M.W. to be "well-kempt." In her April 2024 case notes, Desrosiers noted that "[b]reakfast is usually prepared . . . and [t]he home is usually clean (maintained by sister)."

During his home visit, Saxton also observed his client's bedroom to be "clean and tidy." Although discounting F.M.W.'s appearance, Saxton noted that his client was "dressed properly . . . and [had] appropriate hygiene," having "just received a shower in preparation for our visit." Saxton did not speak directly with any of F.M.W.'s treating physicians and briefly mentioned his client's 2014 POA appointing R.W. as her agent and recommended it be revoked. Saxton

A-0847-24

included information from those interviews he conducted, but none of the lay or expert witnesses submitted certifications or testified. The decision to appoint a guardian for an incapacitated person "made without evidential basis, without examination and cross-examination of lay and expert witnesses, and without a statement of reasons is untenable in the extreme." J.G. v. J.H., 457 N.J. Super. 365, 373 (App. Div. 2019) (quoting Fusco v. Fusco, 186 N.J. Super. 321, 327 (App. Div. 1982)).

Perhaps the Public Guardian was the appropriate entity to be entrusted with the responsibility of being F.M.W.'s guardian. Our decision, however, will have had no bearing on the outcome of the merits of that decision due to F.M.W.'s death. The issue of who should be appointed as F.M.W.'s guardian was contested, and contrary to F.M.W.'s prior decision giving her sister POA. At a minimum, the court was required to explain its reasons for rejecting a family member, as the preferred guardian, and appointing the state agency to act as F.M.W.'s plenary guardian.

Given the importance of the decision of who will be an incapacitated person's surrogate decision-maker in all or some of life's decisions, if the issue is contested, a plenary hearing with the "due process safeguards required by our court rules and statutes," designed to "protect the subject of a guardianship

A-0847-24

hearing" and giving due regard to the statutory preference for a family member, should be held to ensure that the result comports with the incapacitated individual's best interests. S.T., 241 N.J. at 282, 280-81; cf. J.G., 457 N.J. Super. at 373.

In sum, in future proceedings, the court is required to make findings by clear and convincing evidence of a person's incapacity in a guardianship proceeding even if the parties do not contest the issue of capacity. Following a determination of incapacity, "the court must appoint an individual to serve as the guardian." S.T., 241 N.J. at 282 (citing R. 4:86-6(c)). In making that decision, "the court should consider the recommendations of the court-appointed attorney and the wishes of the incapacitated person, if expressed." Macak, 377 N.J. Super. at 176. If the issue of who should serve as guardian is contested, the parties should be permitted limited discovery on that contested issue, to present testimony and other evidence at a plenary hearing or test the credibility of witnesses through cross-examination. See State v. Basil, 202 N.J. 570, 591 (2010) (The right of confrontation "expresses a preference for the in-court testimony of a witness, whose veracity can be tested by the rigors of cross-examination.") (quoting State ex rel. J.A., 195 N.J. 324, 342 (2008)).

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division    A-0847-24