# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3028-22

IN THE MATTER OF THE
ADOPTION OF A MINOR CHILD
by A.R.G. and. A.M.T.G.

_____

Submitted January 8, 2024 – Decided August 15, 2024

Before Judges DeAlmeida, Berdote Byrne, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FA-04-0128-20.

Rutgers Constitutional Rights Clinic, Rutgers Law, attorneys for appellant W.A. (Ronald K. Chen and James A. Rocco, III, on the brief).

BKW Family Law, LLC, attorneys for respondents A.R.G. and A.M.T.G. (Megan E. Watson, on the brief).

Daniel J. Devlin (Van Der Veen Hartshorn & Levin), attorney for appellant K.F., joins in the brief of appellant W.A.

Martine, Katz Scanlon & Schimmel, P.A., attorneys for respondent Adoption Resource Center, d/b/a Adoption ARC, join in the brief of respondents A.R.G. and A.M.T.G.

PER CURIAM

This appeal involves the contested voluntary surrender of P.G. ("Peggy") for adoption by A.R.G. and A.M.T.G.[1] Peggy was born in January 2020 in Pennsylvania to her biological mother, W.A. ("Whitney"), who signed a voluntary surrender and waiver of jurisdiction soon after Peggy's birth, allowing Peggy to be placed with a New Jersey adoption agency. The adoption agency in turn placed her with pre-adoptive parents in Pennsylvania in February 2020.

Whitney, through court-appointed counsel, and her biological mother, K.F. ("Kate"), filed complaints in both Pennsylvania and New Jersey seeking to revoke the adoption, arguing Whitney did not have the requisite mental capacity to sign the adoption papers, including the waiver of jurisdiction allowing the adoption to proceed pursuant to New Jersey law. Appellants rely on Whitney's long history of mental illness, the fact she was deemed incompetent to stand trial in a criminal matter only nine days prior to signing the adoption papers, the hallucinations she experienced while at the hospital delivering Peggy, and the lack of a complete psychiatric evaluation on the day she signed the adoption papers.

---

[1] We use initials and pseudonyms to identify the parties in this case, in accordance with Rule 1:38-3(d)(16) and pursuant to N.J.S.A. 9:3-52.

A-3028-22

The trial court found Whitney had the requisite mental capacity when she signed the adoption papers and ordered the adoption to proceed. On appeal, Whitney and Kate argue the adoption is invalid for two reasons: 1) the trial court erred in finding that Whitney had the requisite mental capacity to sign the adoption papers; 2) per the conflict of laws doctrine, the adoption should not have been subject to New Jersey law; and 3) even if New Jersey law applies, New Jersey statutes and regulations render the adoption invalid.

We conclude Whitney lacked the requisite mental capacity to sign the adoption papers and waiver of jurisdiction. As a result, the trial court lacked jurisdiction over this matter, and the case could not be heard in New Jersey. Therefore, we vacate the court's order. Lacking jurisdiction, we are unable to enter any order with respect to Peggy's temporary or permanent placement. Because we are mindful Peggy has resided with her presumptive adoptive parents since her birth, this order is stayed for thirty days to allow counsel for appellants to contact the Pennsylvania court involved in this matter, so it may take whatever steps it deems appropriate.

I.

We glean the following facts from the record. Whitney is Peggy's biological mother. Whitney was raised by her biological mother, Kate, until the

A-3028-22

age of five. At that time, Kate asked her friend "Vivi" to raise Whitney. Vivi raised Whitney until she was fifteen years old, and Whitney refers to both Kate and Vivi as her "mother."

Vivi testified Whitney's mental illnesses became apparent at approximately the age of thirteen; Whitney was later diagnosed with schizophrenia, bipolar disorder, and impulsive disorder. She testified Whitney is often not compliant with her medication and was either involuntarily or voluntarily hospitalized several times throughout her life. Kate testified Whitney has been hospitalized fifteen to twenty times over the preceding ten years. Whitney also has a teenage daughter, who is cared for collectively by Kate, Vivi, and the daughter's biological father.

Kate testified Whitney was hospitalized in April 2019 and shortly after she signed a medical and financial limited power of attorney ("LPA") designating Kate as her attorney-in-fact.[2]

The record reflects Whitney was hospitalized throughout her pregnancy, totaling over fifty days: July 25, 2019 to August 8, 2019, August 16, 2019 to August 27, 2019, October 15, 2019 to October 18, 2019, November 11, 2019 to November 18, 2019, and December 5, 2019 to December 18, 2019.

---

[2] The LPA is not included in the record on appeal.

A-3028-22

Additionally, from 2012 to 2019, Whitney was involuntarily committed seventeen times and voluntarily committed herself four additional times.

Prior to the baby's birth, Whitney stated she planned for Kate to care for Peggy after she was born, and the prison social worker who attended to Whitney during her incarceration just prior to giving birth was aware of this planned arrangement.

Whitney voluntarily committed herself to Jefferson Hospital for psychiatric treatment on December 31, 2019. There, Whitney was arrested on criminal assault charges. On January 22, 2020, Dr. Jones, a forensic psychiatrist who has performed court-ordered evaluations for twenty-one years, conducted a mental health evaluation of Whitney to determine if she was competent to stand trial for her pending criminal assault charges in the Philadelphia Court of Common Pleas. Dr. Jones opined Whitney was "not competent to assist her own defense." In his report, Dr. Jones wrote Whitney "appears to be actively responding to internal stimuli . . . . She admits to racing thoughts, mood swings, and mania. She admits to auditory hallucinations stating, 'I hear voices that say I feel like I'm molested[,] and that's when I hear voices.'" Dr. Jones's report continues: "She is markedly paranoid . . . . At the present time, [Whitney] is not psychiatrically stable. In her current mental state, she could not

5

meaningfully cooperate with her attorney in her own defense."  He was later qualified as an expert at the hearing and testified that "she really didn't have insight into the degree of her mental illness . . . .  [S]he didn't even understand the charges."  The evaluation took one hour to complete.

Whitney was transferred from her correctional facility to Temple University Hospital ("Temple") five days later to deliver her baby on January 27, 2020.  According to a nurse's report, Whitney was "extremely agitated and yelling" and had "delusions of grandeur stating:  'I am an angel of God.  . . .  I am a doctor and I only need to be 3cm to have this baby.'"

Whitney was seen by Dr. Dolan, an attending OBGYN, and a resident OBGYN.  At first, Whitney refused to be induced, but later agreed.  Dr. Dolan determined Whitney had the capacity to make the decision to be induced and later testified she did not have questions regarding Whitney's capacity. Nevertheless, Dr. Dolan ordered Ativan/Lorazepam to be administered to Whitney intravenously on January 27 and January 28 because Whitney was agitated.  Dr. Dolan also ordered Zyprexa, a psychiatric medication, because it was already prescribed to Whitney.  Although Dr. Dolan reported Whitney was aggressive and abusive toward staff during the early morning of January 28, she

testified a patient can be aggressive and still have the requisite mental capacity to consent to treatment.

That same day, Dr. Chandrasekhara, an attending psychiatrist at Temple, performed a psychiatric exam of Whitney. She observed that Whitney did not maintain proper eye contact, was guarded, and was minimally cooperative. Nevertheless, she found Whitney did not exhibit any symptoms of mania, hallucinations, or paranoia. Dr. Chandrasekhara determined there was no need for further psychiatric evaluations. Although Dr. Chandrasekhara did not make an assessment regarding Whitney's ability to make decisions on her own behalf, she testified any physician can conduct a capacity assessment to determine whether a patient has the capacity to make a decision in that moment.

Peggy was born on January 28, at approximately 3 p.m. Earlier that day, Temple social worker Amelia Scell met with Whitney to perform a social assessment, which is standard procedure for an incarcerated patient who is about to give birth. According to Scell's testimony, Whitney stated she was interested in exploring adoption and, after reviewing the resources Scell shared with her, Whitney chose to speak with the Adoption Resource Center (ARC). Scell also testified Whitney went "back and forth" in deciding between adoption and having Vivi care for the child.

7

ARC Executive Director Merle Gutterman met with Whitney for a half hour that same day to give her counseling. According to Merle Gutterman's testimony, Whitney did not want her family members to raise Peggy because Whitney was raised in foster care and wanted a more stable environment for the baby. Merle Gutterman testified that Whitney, despite being in active labor at the time she met with her, was calm, cool, and collected, and she seemed to understand what she was doing. She testified she was unaware of Whitney's mental health diagnoses at the time of the meeting.

Contrary to Merle Gutterman's testimony, after meeting with ARC, Whitney told Scell that she did not want to move forward with the adoption and would prefer Vivi to care for Peggy. Because Whitney identified Vivi as her caregiver, Scell called Vivi to let her know Whitney was in the hospital and had delivered the baby. Scell also advised Vivi to notify the Department of Human Services prior to the baby going home with Vivi. Kate and Vivi came to the hospital and presented the LPA but were told Whitney did not want to see her family and the LPA was not in effect because a Temple doctor had not found Whitney incompetent.

8

On January 29, Scell met with Whitney to confirm she still wanted Vivi to care for the baby. Whitney told her she had changed her mind again and wanted to proceed with adoption.

That same day, Dr. Sikora, a resident OBGYN with no specialized training in psychiatry, met with Whitney to determine whether she had capacity to place Peggy for adoption. Dr. Sikora did not have an independent recollection of that event and instead testified based on her notes from the day she examined Whitney. According to Dr. Sikora's notes, Whitney understood her options and the consequences of both choosing and not choosing adoption. Further, Whitney was able to articulate why she wanted to place the baby for adoption. Based on this assessment, Dr. Sikora determined Whitney had the capacity to make the decision to place her baby for adoption. Whitney signed the initial adoption paperwork that day.

Whitney did not identify the biological father of the child to ARC. However, according to Kate, "Chuck," whom Whitney met during a previous incarceration, is Peggy's biological father.

9

Whitney was released from Temple on January 30 and was transferred back to the correctional facility. ARC staff Tara Gutterman,[3] Laura Hoffman, and Merle Gutterman were scheduled to meet with Whitney at the correctional facility to finalize the adoption on January 31. That morning, Tara Gutterman emailed Jonathan Houlon, the Chief Deputy City Solicitor for the Philadelphia Department of Human Services (DHS), before her scheduled meeting with Whitney regarding a potential issue Temple had raised with respect to the adoption.

In Tara Gutterman's email to Houlon, she explained:

> Temple called DHS because birth mom at first was not sure if she wanted to move forward with adoption and also did not want her mother to take custody [of] the baby.
>
> Temple then advised DHS that mother was proceeding forward with adoption but DHS still needed to come out. They came out [sic] 1/30/20 yesterday. . . .
>
> DHS is now saying that the birth mother is not competent to make decisions and that a psychiatric [sic] is needed. Although she has a mental health history, to the best of my knowledge, Temple never questioned her competency nor did they have her evaluated by a doctor who are [sic] the only ones to assess her competency. The ARC social worker is very clear that birth mom understands what adoption is and fully understood the

---

[3] Tara Gutterman is ARC's attorney and filed the adoption complaint in New Jersey.

10

> implications of this decision. This afternoon, final surrenders will be signed at the prison. . . .
>
> . . . .
>
> We do not believe that DHS has the authority to step in and hold up this plan. There is no basis for such . . . . We believe that DHS feels that the grandmother must be given this baby. Under adoption law, as you know, there is no mandate for family reunification.

Houlon responded, asking for the name of the DHS worker and saying he would look into it. When Houlon responded with an answer, he simply wrote, "Baby is being released to you," without any explanation. During his testimony, Houlon explained that Philadelphia DHS does not regulate private adoption agencies; rather, Pennsylvania DHS does. Further, Philadelphia DHS would not be responsible for Peggy's placement or release or regulating the interactions between Whitney and the adoption agency. Houlon clarified Temple would be responsible for releasing the child.

According to Tara Gutterman's testimony, ARC moved forward with the adoption. On January 31, 2020, Whitney signed a "New Jersey Voluntary Surrender to an Approved Agency," a "Surrender of a Parents [sic] Custodial Rights to Approved Agency," and a "Voluntary Jurisdictional Waiver." (collectively "adoption papers"). The jurisdictional waiver states, in pertinent part:

I, [Whitney], have been informed that I have the right to require that my parental rights to my child, [Peggy], born on January 28, 2020, be terminated in the Commonwealth of Pennsylvania pursuant to the laws of Pennsylvania. I am not required to have my rights terminated in any other state. In Pennsylvania, I, [Whitney], cannot sign the consent until 72 hours after the birth of the child and I have a 30[-]day revocation period after the consent is signed to revoke my consent.

As the birth father [sic], I may sign a consent at any time before birth, but I have 30 days after either the birth of the child or my execution of the consent (whichever occurs later) to revoke my consent.

By signing a consent, surrender, or similar legal document for adoption from New Jersey, I may be waiving my right to revoke my consent forever and I may not be entitled to any hearing or any other protection of Pennsylvania law in the event I later seek to revoke my consent.

By choosing to use New Jersey law, I am choosing to not be eligible for the PACA law which allows post adoption contracts to be legally enforceable if an adoption is made final in the state of Pennsylvania.

I have voluntarily placed my child for adoption using Adoption ARC as a NJ licensed agency with the knowledge and understanding that the proposed adopting parent reside in outside of Pa [sic]. Therefore, I request the appropriate Pennsylvania authorities responsible for the Interstate Compact on the Placement of Children approve this adoption plan as represented herein.

In early February 2020, Whitney was transferred from the correctional facility to Norristown State Hospital for further psychiatric treatment. Despite the language in the waiver of jurisdiction stating the proposed adopting parents reside "in outside" of Pennsylvania, Peggy was placed with presumptive adoptive parents A.R.G. and A.M.T.G. on February 5, in Pennsylvania.

On February 18, Whitney called ARC to revoke her consent. She was told the adoption was irrevocable. On February 21, Whitney sent a letter to ARC stating she was withdrawing her decision to place Peggy for adoption, and she wanted Kate to have full custody of Peggy.

On February 5, 2020, ARC filed a complaint for adoption on behalf of the pre-adoptive parents in the Superior Court of New Jersey, Chancery Division/Family Part, Camden County. A preliminary order was issued on February 20, 2020. On the same day, Kate, unaware of where Peggy was placed, filed a custody application in Philadelphia. On April 30, on Whitney's behalf, Kate filed a petition for annulment of Whitney's surrender in Pennsylvania. On July 27, as soon as she learned the adoption complaint was filed in New Jersey, Whitney filed a petition to revoke consent for adoption in the Superior Court of New Jersey, Chancery Division/Family Part, Camden County.

A-3028-22

The Superior Court held a non-consecutive nine-day trial, from November 2022 until May 2023. The trial court identified the issue before it as whether Whitney had the requisite mental capacity to sign the adoption papers. The court issued its opinion on the record and found Whitney had the requisite capacity. On May 23, 2023, the trial court issued an order allowing the adoption to proceed.[4]

## II.

We review issues of statutory interpretation de novo. Kocanowski v. Twp. of Bridgewater, 237 N.J. 3, 9 (2019). "'[A] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Our review of factual findings made during trial is limited and we apply a deferential standard. Balducci v. Cige, 240 N.J. 574, 595 (2020). If the trial judge's findings are "supported by adequate, substantial and credible evidence,"

---

[4] The record does not reflect that any party sought a stay, or the current status of the adoption proceedings. We requested supplemental briefing and were informed that Peggy continues to reside in Pennsylvania with her pre-adoptive parents. The adoption has not been finalized because of this pending appeal.

we are bound by those findings. <u>Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am.</u>, 65 N.J. 474, 484 (1974); <u>see also</u> <u>Cesare v. Cesare</u>, 154 N.J. 394, 411-12 (1998).

III.

A. <u>Standing</u>.

As an initial matter, respondents primary focus is their claim that there is no aggrieved party with standing to file an appeal. Respondents argue Kate is the only party who filed claims and does not have an interest affected by the trial court's judgment. That argument is belied by the record, which demonstrates Whitney raised these issues and has standing to do so.

First, the record reflects Whitney filed a petition to revoke consent for adoption in the Chancery Division on July 27, 2020, and her interests were represented by her guardian ad litem, appointed by a court in Pennsylvania, throughout the trial. The guardian ad litem retained New Jersey counsel to represent Whitney's interests in New Jersey. The notice of appeal lists Whitney as a party appealing the case to this court.

Respondents also claim that some of the issues raised on appeal were not raised before the trial court and are not properly before us. However, jurisdictional issues and issues of great public interest may be raised for the first

15

time on appeal. State v. Robinson, 200 N.J. 1, 20 (2009). Even if some issues were not brought up during the trial court proceedings, the issues fall under the Robinson exception. Conflict of law issues and whether an adoption would be valid pursuant to New Jersey law are likewise both matters of great public importance because they "foster comity by promoting 'harmonious relations'" . . . between and among states," Fairfax Fin. Holdings, Ltd. v. S.A.C. Cap. Mgmt., L.L.C., 450 N.J. Super. 1, 42 (App. Div. 2017) (quoting Restatement (Second) of Conflict of Laws, § 6(1) (1971)), and concern Whitney's constitutionally protected parental rights, E.S. v. H.A., 451 N.J. Super. 374, 383-84 (App. Div. 2017), respectively. Whitney has standing because her constitutional rights to parent her biological child are implicated. Pursuant to the United States, Pennsylvania, and New Jersey constitutions, parents have an undeniable, fundamental right to care for their children. See Santosky v. Kramer, 455 U.S. 745, 753 (1982); J.C.D. v. A.L.R., 303 A.3d 425, 433 (Penn. 2023); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999).

B.  Jurisdiction.

On appeal, Whitney argues New Jersey courts lack jurisdiction over the matter because all the parties were domiciled in Pennsylvania at all times. Additionally, Whitney argues even if New Jersey has jurisdiction, Pennsylvania

16

law should have been applied by the trial court. Regardless, she maintains an adoption would be invalid pursuant to both Pennsylvania and New Jersey law.

Pursuant to New Jersey case law generally, the Superior Court, Family Part has jurisdiction over adoptions where the child, the adoptive parents, or biological parents are domiciled in New Jersey. In re Adoption of Child by T.W.C., 270 N.J. Super. 225, 230 (App. Div. 1994); In re Adoption of a Child by McKinley, 157 N.J. Super. 293, 297 (Ch. Div. 1978).

However, our adoption statutes, N.J.S.A. 9:3-47 and 9:3-48, identify two types of proceedings: 1) those where the child is received from a State-approved agency, and 2) private adoptions. The New Jersey Legislature streamlined the adoption process in cases where a child is voluntarily surrendered to an adoption agency licensed in New Jersey. The purpose of N.J.S.A. 9:3-47 is to facilitate adoptions of children born outside of New Jersey. See State v. Wasserman, 75 N.J. Super. 480, 488-89 (App. Div. 1962) (finding a "paramount and dominant objective" of the statues is "to prevent the trafficking for profit in human lives and to extinguish from our society the so-called 'black market' and 'gray market' in babies.").

We concluded In re Adoption of a Child by D.F.H. that the Superior Court has jurisdiction over an adoption if the agency the adoptive parents received the

child from is an agency licensed in New Jersey, regardless of the residency of the parties. 230 N.J. Super. 445, 446 (App. Div. 1989) ("We . . . hold that the Legislature has given the Superior Court jurisdiction to grant adoptions to nonresidents if the child was placed with them by an adoption agency approved by the New Jersey Department of Human Services."). We determined in D.F.H. that N.J.S.A. 9:3-47confers subject matter jurisdiction to New Jersey courts over adoptions involving children voluntarily placed in New Jersey approved agencies, regardless of where the children were born or initially placed.

Here, although all the parties were domiciled in Pennsylvania, Whitney signed the waiver of jurisdiction allegedly placing the child with a licensed New Jersey adoption agency. Irrespective of the validity of the waiver of jurisdiction, both Kate and Whitney summitted to the in personam jurisdiction of New Jersey courts by filing claims in New Jersey. Therefore, the trial court properly identified the issue before it as whether Whitney had conducted a valid surrender of the child to ARC, a licensed New Jersey adoption agency, and a valid waiver of jurisdiction. Only after these prerequisites were satisfied could the court exercise jurisdiction in accordance with D.F.H.

Thus, the court was required to address whether Whitney had the requisite mental capacity to execute the voluntary surrender and waiver of jurisdiction.

18

The trial court found Whitney had capacity to sign the adoption papers, relying on the trial testimony.

Determining capacity is a fact-specific analysis. See S.T. v.1515 Broad St., LLC, 241 N.J. 257, 278 (2020) (noting the role of a guardian ad litem appointed pursuant to Rule 4:26-2(b) "is to act as an independent investigator and inform the court on the subject of the client's mental capacity"); In re Guardianship of Macak, 377 N.J. Super. 167, 175-76 (App. Div. 2005) (holding the court must independently consider all proffered evidence and determine capacity by clear and convincing evidence). We engage in a limited review and gives deference to the trial court's factual findings if they are "supported by adequate, substantial and credible evidence." Rova Farms, 65 N.J. at 484; see also Cesare, 154 N.J. at 411-12.

The trial court found the testimony of the Temple doctors and social worker dispositive. Specifically, the psychologist, Dr. Chandrasekhara, determined there was no need for further psychiatric evaluations, and Dr. Sikora determined that Whitney had the capacity to place Peggy for adoption. The trial court acknowledged Dr. Jones had found Whitney lacked capacity to stand trial only nine days prior to Peggy's birth but found that the testimony of the doctors

19

A-3028-22

who evaluated Whitney before she signed the preliminary papers more persuasive.

We conclude there is insufficient evidence in the record to conclude Whitney had the requisite mental capacity to execute the adoption papers, including the waiver of jurisdiction. Whitney had a long history of mental illness not controlled by medication. She was hospitalized for over fifty days during her pregnancy and voluntarily committed herself to Jefferson Hospital for psychiatric treatment on December 31, 2019, less than a month before Peggy's birth.

Prior to the baby's birth, Whitney communicated her wishes regarding Peggy: she planned for Kate to care for Peggy after the baby was born, and the prison social worker who attended to her was aware of this planned arrangement. In fact, in April 2019, Whitney signed a medical and financial LPA, designating Kate her attorney-in-fact. Temple refused to acknowledge the LPA because its doctor deemed Whitney was not incompetent, despite the LPA having been limited.

Seven days before Whitney gave birth, Dr. Jones, an expert in forensic psychiatry, determined she was not competent to stand trial for her pending criminal assault charges. Competency to stand trial presents a relatively low

20

bar.  See State v. Gorthy, 226 N.J. 516, 532-32 (2016).  He noted Whitney "appears to be actively responding to internal stimuli . . . .  She admits to racing thoughts, mood swings, and mania. . . . [and] auditory hallucinations."  He further observed she is "markedly paranoid," and, at that time, "not psychiatrically stable."  Moreover, there is evidence in the hospital records that Whitney appeared to be suffering from these delusions during Peggy's birth and after she returned to the correctional facility, necessitating psychiatric treatment in early February.  Because we conclude the trial court erred when it found Whitney had the capacity to execute the adoption papers, the voluntary surrender document is void.  Peggy was not voluntarily placed with an agency in New Jersey, and we conclude the trial court lacked jurisdiction to hear the matter.

    C. Conflict of Laws.

Whitney additionally argues conflict of laws principles required Pennsylvania law be applied to this case.  Respondents claim New Jersey law is proper because Whitney specifically chose New Jersey law.  Because we conclude Whitney did not have the requisite capacity to execute the adoption papers, specifically the waiver of jurisdiction and the trial court subsequently erred in exercising jurisdiction, appellant's choice-of-law arguments are rendered moot.  See Fairfax Fin., 450 N.J. Super. at 42 ("The first step is to

establish that 'an actual conflict exists' between the laws of the <u>involved</u> states." (emphasis added) (quoting <u>P.V. ex rel. T.V. v. Camp Jaycee</u>, 197 N.J. 132, 143 (2008))); <u>Ginsberg ex rel. Ginsberg v. Quest Diagnostics, Inc.</u>, 441 N.J. Super. 198, 226 (App. Div. 2015) (recognizing the first step in our choice-of-law analysis is whether "an actual conflict of laws is present between the . . . states <u>implicated</u> in [the] case" (emphasis added)).  Without jurisdiction, New Jersey is neither involved nor implicated in this matter; its only connection lies in the fact ARC is licensed to conduct adoptions in New Jersey.

In light of our conclusion, we vacate the trial court's order and dismiss the complaint.  Because New Jersey courts lack jurisdiction over this matter, and the issue of Peggy's best interest is foremost, this order is stayed for a period of thirty days to allow any party to make the appropriate applications to Pennsylvania state courts.

The order of the trial court is vacated, and the complaint is dismissed with prejudice.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3028-22